# RENO, ATTORNEY GENERAL *v.* BOSSIER PARISH SCHOOL BOARD

No. 98–405.  Argued April 26, 1999—Reargued October 6, 1999—Decided
January 24, 2000*

---

*Together with No. 98–406, *Price et al.* v. *Bossier Parish School Bd.*,
also on appeal from the same court.

322

SCALIA, J., delivered the opinion of the Court, Part II of which was unanimous, and Parts I, III, and IV of which were joined by REHNQUIST, C. J., and O'CONNOR, KENNEDY, and THOMAS, JJ. THOMAS, J., filed a concurring opinion, *post*, p. 341. SOUTER, J., filed an opinion concurring in part and dissenting in part, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post*, p. 341. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, *post*, p. 373. BREYER, J., filed a dissenting opinion, *post*, p. 374.

*Paul R. Q. Wolfson* reargued the cause for appellant in No. 98–405. On the briefs on reargument was *Solicitor General Waxman*. With *Mr. Wolfson* on the briefs on the original argument were *Mr. Waxman, Acting Assistant Attorney General Lee, Deputy Solicitor General Underwood, Mark L. Gross*, and *Louis E. Peraertz*.

*Patricia A. Brannan* reargued the cause for appellants in No. 98–406. With her on the briefs were *John W. Borkowski, Barbara R. Arnwine, Thomas J. Henderson*, and *Edward Still*.

*Michael A. Carvin* reargued the cause for appellee in both cases. With him on the brief were *David H. Thompson, Craig S. Lerner*, and *Michael E. Rosman*.

JUSTICE SCALIA delivered the opinion of the Court.

These cases present the question whether § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as amended, 42 U. S. C.

§ 1973c, prohibits preclearance of a redistricting plan enacted with a discriminatory but nonretrogressive purpose.

I

This is the second time the present cases are before us, and we thus recite the facts and procedural history only in brief. Like every other political subdivision of the State of Louisiana, Bossier Parish, because of its history of discriminatory voting practices, is a jurisdiction covered by § 5 of the Voting Rights Act. See 42 U. S. C. §§ 1973c, 1973b(a), (b); 30 Fed. Reg. 9897 (1965). It is therefore prohibited from enacting any change in a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," without first obtaining either administrative preclearance from the Attorney General or judicial preclearance from the United States District Court for the District of Columbia. 42 U. S. C. § 1973c.

Bossier Parish is governed by a 12-member Police Jury elected from single-member districts for 4-year terms. In the early 1990's, the Police Jury set out to redraw its electoral districts in order to account for demographic changes reflected in the decennial census. In 1991, it adopted a redistricting plan which, like the plan then in effect, contained no majority-black districts, although blacks made up approximately 20% of the parish's population. On May 28, 1991, the Police Jury submitted its new districting plan to the Attorney General; two months later, the Attorney General granted preclearance.

The Bossier Parish School Board (Board) is constituted in the same fashion as the Police Jury, and it too undertook to redraw its districts after the 1990 census. During the course of that redistricting, appellant-intervenor George Price, president of the local chapter of the National Association for the Advancement of Colored People (NAACP), proposed that the Board adopt a plan with majority-black districts. In the fall of 1992, amid some controversy, the

Board rejected Price's suggestion and adopted the Police Jury's 1991 redistricting plan as its own.

On January 4, 1993, the Board submitted its redistricting plan to the Attorney General for preclearance. Although the Attorney General had precleared the identical plan when submitted by the Police Jury, she interposed a formal objection to the Board's plan, asserting that "new information"—specifically, the NAACP plan proposed by appellant-intervenor Price—demonstrated that "black residents are sufficiently numerous and geographically compact so as to constitute a majority in two single-member districts." App. to Juris. Statement in No. 98–405, p. 235a. The Attorney General disclaimed any attempt to compel the Board to "adopt any particular plan," but maintained that the Board was "not free to adopt a plan that unnecessarily limits the opportunity for minority voters to elect their candidates of choice." *Ibid.*

After the Attorney General denied the Board's request for reconsideration, the Board filed the present action for judicial preclearance of the 1992 plan in the United States District Court for the District of Columbia. Section 5 of the Voting Rights Act authorizes preclearance of a proposed voting change that "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U. S. C. § 1973c. Before the District Court, appellants conceded that the Board's plan did not have a prohibited "effect" under § 5, since it did not worsen the position of minority voters. (In *Beer* v. *United States*, 425 U. S. 130 (1976), we held that a plan has a prohibited "effect" only if it is retrogressive.) Instead, appellants made two distinct claims. First, they argued that preclearance should be denied because the Board's plan, by not creating as many majority-black districts as it should create, violated § 2 of the Voting Rights Act, which bars discriminatory voting practices. Second, they contended that,

although the Board's plan would have no retrogressive effect, it nonetheless violated §5 because it was enacted for a discriminatory "purpose."

The District Court granted preclearance. *Bossier Parish School Bd.* v. *Reno*, 907 F. Supp. 434 (DC 1995). As to the first of appellants' two claims, the District Court held that it could not deny preclearance of a proposed voting change under §5 simply because the change violated §2. Moreover, in order to prevent the Government "[from doing] indirectly what it cannot do directly," the District Court stated that it would "not permit section 2 evidence to prove discriminatory purpose under section 5." *Id.*, at 445. As to the second of appellants' claims, the District Court concluded that the Board had borne its burden of proving that the 1992 plan was adopted for two legitimate, nondiscriminatory purposes: to assure prompt preclearance (since the identical plan had been precleared for the Police Jury), and to enable easy implementation (since the adopted plan, unlike the NAACP's proposed plan, required no redrawing of precinct lines). *Id.*, at 447. Appellants filed jurisdictional statements in this Court, and we noted probable jurisdiction. *Reno* v. *Bossier Parish School Bd.*, 517 U. S. 1232 (1996).

On appeal, we agreed with the District Court that a proposed voting change cannot be denied preclearance simply because it violates §2, but disagreed with the proposition that *all* evidence of a dilutive (but nonretrogressive) effect forbidden by §2 was irrelevant to whether the Board enacted the plan with a retrogressive purpose forbidden by §5. *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 486–487 (1997) *(Bossier Parish I)*. Since some language in the District Court's opinion left us uncertain whether the court had in fact applied that proposition in its decision, we vacated and remanded for further proceedings as to the Board's purpose in adopting the 1992 plan. *Id.*, at 486. In light of our disposition, we left open the additional question "whether

the § 5 purpose inquiry ever extends beyond the search for retrogressive intent." *Ibid.* "The existence of such a purpose," we said, "and its relevance to § 5, are issues to be decided on remand." *Ibid.*

On remand, the District Court, in a comparatively brief opinion relying on, but clarifying, its extensive earlier opinion, again granted preclearance. 7 F. Supp. 2d 29 (DC 1998). First, in response to our invitation to address the existence of a discriminatory but nonretrogressive purpose, the District Court summarily concluded that "the record will not support a conclusion that extends beyond the presence or absence of retrogressive intent." *Id.,* at 31. It noted that one could "imagine a set of facts that would establish a 'nonretrogressive, but nevertheless discriminatory, purpose,' but those imagined facts are not present here." *Ibid.* The District Court therefore left open the question that we had ourselves left open on remand: namely, whether the § 5 purpose inquiry extends beyond the search for retrogressive intent.

Second, the District Court considered, at greater length, how any dilutive impact of the Board's plan bore on the question whether the Board enacted the plan with a retrogressive intent. It concluded, applying the multifactor test we articulated in *Arlington Heights* v. *Metropolitan Housing Development Corp.,* 429 U. S. 252 (1977), that allegations of dilutive effect and of discriminatory animus were insufficient to establish retrogressive intent. 7 F. Supp. 2d, at 31–32.

In their jurisdictional statements in this Court, appellants contended, first, that the District Court's conclusion that there was no evidence of discriminatory but nonretrogressive purpose was clearly erroneous, and second, that § 5 of the Voting Rights Act prohibits preclearance of a redistricting plan enacted with a discriminatory but nonretrogressive purpose. Appellants did not challenge the District Court's determination that there was no evidence of retrogressive intent. We again noted probable jurisdiction. 525 U. S. 1118 (1999).

## II

Before proceeding to the merits, we must dispose of a challenge to our jurisdiction. The Board contends that these cases are now moot, since its 1992 plan "will never again be used for any purpose." Motion to Dismiss or Affirm 9. Under Louisiana law, school board members are elected to serve 4-year terms. La. Rev. Stat. Ann. § 17:52(A) (West 1995). One month after appellants filed the jurisdictional statements for this appeal, the scheduled 1998 election for the Board took place. The next scheduled election will not occur until 2002, by which time, as appellants concede, the data from the upcoming decennial census will be available and the Board will be required by our "one-man-one-vote" precedents to have a new apportionment plan in place. Accordingly, appellee argues, the District Court's declaratory judgment with respect to the 1992 plan is no longer of any moment and the dispute no longer presents a live "case or controversy" for purposes of Article III of the Constitution. *Preiser* v. *Newkirk,* 422 U. S. 395, 401 (1975); *Mills* v. *Green,* 159 U. S. 651, 653 (1895).

Appellants posit several contingencies in which the Board's 1992 plan would be put to use—including resignation or death of one of the 12 Board members before 2002, and failure to agree upon a replacement plan for the 2002 election. They also assert that, if we were to hold preclearance improper, they "could seek" an injunction voiding the elections held under the 1992 plan and ordering a special election, Brief for Appellants Price et al. Opposing Motion to Dismiss or Affirm 3, and "might be entitled" to such an injunction, Brief for Appellant Reno in Opposition to Motion to Dismiss or Affirm 2. We need not pause to consider whether the possibility of these somewhat speculative and uncertain events suffices to keep these cases alive, since in at least one respect the 1992 plan will have probable continuing effect: Absent a successful subsequent challenge under § 2, it, rather than the 1980 predecessor plan—which contains quite

different voting districts—will serve as the baseline against which appellee's next voting plan will be evaluated for the purposes of preclearance. Whether (and precisely how) that future plan represents a change from the baseline, and, if so, whether it is retrogressive in effect, will depend on whether preclearance of the 1992 plan was proper.

We turn, then, to the merits.

## III

Appellants press the two claims initially raised in their jurisdictional statements: first, that the District Court's factual conclusion that there was no evidence of discriminatory but nonretrogressive intent was clearly erroneous, and second, that § 5 of the Voting Rights Act prohibits preclearance of a redistricting plan enacted with a discriminatory but nonretrogressive purpose. Our resolution of the second claim renders it unnecessary to address the first. When considered in light of our longstanding interpretation of the "effect" prong of § 5 in its application to vote-dilution claims, the language of § 5 leads to the conclusion that the "purpose" prong of § 5 covers only retrogressive dilution.

As noted earlier, in order to obtain preclearance under § 5, a covered jurisdiction must demonstrate that the proposed change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U. S. C. § 1973c. A covered jurisdiction, therefore, must make two distinct showings: first, that the proposed change "does not have the purpose . . . of denying or abridging the right to vote on account of race or color," and second, that the proposed change "will not have the effect of denying or abridging the right to vote on account of race or color." The covered jurisdiction bears the burden of persuasion on both points. See *Bossier Parish I*, 520 U. S., at 478 (judicial preclearance); 28 CFR § 51.52(a) (1999) (administrative preclearance).

In *Beer* v. *United States*, 425 U. S. 130 (1976), this Court addressed the meaning of the no-effect requirement in the context of an allegation of vote dilution. The case presented the question whether a reapportionment plan that would have a discriminatory but nonretrogressive effect on the rights of black voters should be denied preclearance. Reasoning that § 5 must be read in light of its purpose of "insur[ing] that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise," we held that "a legislative reapportionment that enhances the position of racial minorities with respect to their effective exercise of the electoral franchise can hardly have the 'effect' of diluting or abridging the right to vote on account of race within the meaning of § 5." *Id.*, at 141. In other words, we concluded that, in the context of a § 5 challenge, the phrase "denying or abridging the right to vote on account of race or color"—or more specifically, in the context of a vote-dilution claim, the phrase "abridging the right to vote on account of race or color"—limited the term it qualified, "effect," to retrogressive effects.

Appellants contend that in qualifying the term "purpose," the very same phrase does *not* impose a limitation to retrogression—*i. e.*, that the phrase "abridging the right to vote on account of race or color" means retrogression when it modifies "effect," but means discrimination more generally when it modifies "purpose." We think this is simply an untenable construction of the text, in effect recasting the phrase "does not have the purpose and will not have the effect of $x$" to read "does not have the purpose of $y$ and will not have the effect of $x$." As we have in the past, we refuse to adopt a construction that would attribute different meanings to the same phrase in the same sentence, depending on which object it is modifying. See *BankAmerica Corp.* v. *United States*, 462 U. S. 122, 129 (1983) (declining to give

different meanings to the phrase "other than" when it modified "banks" and "common carriers" in the same clause).

Appellants point out that we did give the purpose prong of § 5 a broader meaning than the effect prong in *Richmond* v. *United States*, 422 U. S. 358 (1975). That case involved requested preclearance for a proposed annexation that would have reduced the black population of the city of Richmond, Virginia, from 52% to 42%. We concluded that, although the annexation may have had the effect of creating a political unit with a lower percentage of blacks, so long as it "fairly reflect[ed] the strength of the Negro community as it exist[ed] after the annexation" it did not violate § 5. *Id.*, at 371. We reasoned that this interpretation of the effect prong of § 5 was justified by the peculiar circumstances presented in annexation cases:

> "To hold otherwise would be either to forbid all such annexations or to require, as the price for approval of the annexation, that the black community be assigned the same proportion of council seats as before, hence perhaps permanently overrepresenting them and underrepresenting other elements in the community, including the nonblack citizens in the annexed area. We are unwilling to hold that Congress intended either consequence in enacting § 5." *Ibid.*

We refused, however, to impose a similar limitation on § 5's purpose prong, stating that preclearance could be denied when the jurisdiction was acting with the purpose of effecting a percentage reduction in the black population, even though it could not be denied when the jurisdiction's action merely had that effect. *Id.*, at 378–379.

It must be acknowledged that *Richmond* created a discontinuity between the effect and purpose prongs of § 5. We regard that, however, as nothing more than an *ex necessitate* limitation upon the effect prong in the particular context of annexation—to avoid the invalidation of all annexations of

areas with a lower proportion of minority voters than the annexing unit. The case certainly does not stand for the proposition that the purpose and effect prongs have fundamentally different meanings—the latter requiring retrogression, and the former not—which is what is urged here. The approved *effect* of the redistricting in *Richmond,* and the hypothetically disapproved *purpose, were both retrogressive.* We found it necessary to make an exception to normal retrogressive-*effect* principles, but not to normal retrogressive-*purpose* principles, in order to permit routine annexation. That sheds little light upon the issue before us here.

Appellants' only textual justification for giving the purpose and effect prongs different meanings is that to do otherwise "would reduce the purpose prong of Section 5 to a trivial matter," Brief for Federal Appellant on Reargument 13; would "effectively delet[e] the 'purpose' prong," Reply Brief for Appellants Price et al. on Reargument 3; and would give the purpose prong "a trivial reach, limited to the case of the incompetent retrogressor," Reply Brief for Federal Appellant 9. If this were true—and if it were adequate to justify giving the very same words a different meaning when qualifying "purpose" than when qualifying "effect"—one would expect appellants to cite at least some instances in which this Court applied such muscular construction to the innumerable statutes barring conduct with. a particular "purpose or effect." See, *e. g.,* 7 U. S. C. § 192(d) (prohibiting sale of any article "for the purpose or with the effect of manipulating or controlling prices" in the meatpacking industry); 12 U. S. C. § 1467a(c)(1)(A) (barring savings and loan holding companies from engaging in any activity on behalf of a savings association subsidiary "for the purpose or with the effect of evading any law or regulation applicable to such savings association"); 47 U. S. C. § 541(b)(3)(B) (1994 ed., Supp. III) (prohibiting cable franchising authorities from imposing any requirement that "has

the purpose or effect of prohibiting, limiting, restricting, or conditioning the provision of a telecommunications service by a cable operator or an affiliate thereof"). They cite not a single one, and we are aware of none.

It is true enough that, whenever Congress enacts a statute that bars conduct having "the purpose or effect of $x$," the purpose prong has application entirely separate from that of the effect prong only with regard to unlikely conduct that has "the purpose of $x$" but fails to have "the effect of $x$"— in the present context, the conduct of a so-called "incompetent retrogressor." The purpose prong has *value and effect,* however, even when it does not cover additional conduct. With regard to conduct that has both "the purpose of $x$" and "the effect of $x$," the Government need only prove that the conduct at issue has "the purpose of $x$" in order to prevail. In the specific context of § 5, where the covered jurisdiction has the burden of persuasion, the Government need only refute the covered jurisdiction's prima facie showing that a proposed voting change does not have a retrogressive purpose in order for preclearance to be denied. When it can do so, it is spared the necessity of countering the jurisdiction's evidence regarding actual retrogressive effect—which, in vote-dilution cases, is often a complex undertaking. This advantage, plus the ability to reach malevolent incompetence, may not represent a massive addition to the effect prong, but it is enough to justify the separate existence of the purpose prong in this statute, and is no less than what justifies the separate existence of such a provision in many other laws.[1]

---

[1] JUSTICE SOUTER criticizes us for "assum[ing] that purpose is easier to prove than effect . . . in voting rights cases." *Post,* at 358, n. 10 (opinion concurring in part and dissenting in part). As is obvious from our discussion in text, we do not suggest that purpose is *always* easier to prove, but simply that it may *sometimes* be (which suffices to give force to the "purpose" prong without the necessity of doing violence to the English language). Indeed, JUSTICE SOUTER acknowledges that "intent to dilute is conceptually simple, whereas a dilutive abridgment-in-fact is not readily defined and identified independently of dilutive intent." *Post,* at 367.

At bottom, appellants' disagreement with our reading of §5 rests not upon textual analysis, but upon their opposition to our holding in *Beer.* Although they do not explicitly contend that *Beer* should be overruled, they all but do so by arguing that it would be "untenable" to conclude (as we did in *Beer*) that the phrase "abridging the right to vote on account of race or color" refers only to retrogression in §5, Reply Brief for Federal Appellant on Reargument 1, in light of the fact that virtually identical language elsewhere in the Voting Rights Act—and indeed, in the Fifteenth Amendment—has never been read to refer only to retrogression. See §2(a) of the Voting Rights Act, 42 U. S. C. §1973(a) ("No voting [practice] shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . ."); U. S. Const., Amdt. 15, §1 ("The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude").[2] The term "abridge," however—whose

_____

[2] Appellants also cite §3(c) of the Voting Rights Act, which provides, with regard to a court that has found a violation of the right to vote guaranteed by the Fourteenth or Fifteenth Amendment, that "the court . . . shall retain jurisdiction for such period as it may deem appropriate and during such period no voting [practice] different from that in force or effect at the time the proceeding was commenced shall be enforced unless and until the court finds that such [practice] does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color . . . ." 42 U. S. C. §1973a(c). This provision does not assist appellants' case because it is not at all clear that it confers the power to deny approval to nonretrogressive redistricting. That is to say, it may well contemplate that, once a court has struck down an unconstitutional practice and granted relief with regard to that practice, it may assume for that jurisdiction a function identical to that of the District Court for the District of Columbia in §5 preclearance proceedings. This is suggested by the fact that the State may avoid the court's jurisdiction in this regard by obtaining preclearance from the Attorney General; and that §3(c), like §5, explicitly leaves open the possibility that a proposed change approved by the court can be challenged as unconstitutional

core meaning is "shorten," see Webster's New International Dictionary 7 (2d ed. 1950); American Heritage Dictionary 6 (3d ed. 1992)—necessarily entails a comparison. It makes no sense to suggest that a voting practice "abridges" the right to vote without some baseline with which to compare the practice. In §5 preclearance proceedings—which uniquely deal only and specifically with *changes* in voting procedures—the baseline is the status quo that is proposed to be changed: If the change "abridges the right to vote" relative to the status quo, preclearance is denied, and the status quo (however discriminatory *it* may be) remains in effect. In §2 or Fifteenth Amendment proceedings, by contrast, which involve not only changes but (much more commonly) the status quo itself, the comparison must be made with a hypothetical alternative: If the *status quo* "results in [an] abridgement of the right to vote" or "abridge[s] [the right to vote]" relative to what the right to vote *ought to be*, the status quo itself must be changed. Our reading of "abridging" as referring only to retrogression in §5, but to discrimination more generally in §2 and the Fifteenth Amendment, is faithful to the differing contexts in which the term is used.[3]

---

in a "subsequent action." *Ibid.* We of course intimate no holding on this point, but limit our conclusion to the nonprobative character of §3(c) with regard to the issue in the present cases.

[3] Even if §5 did not have a different baseline than the Fifteenth Amendment, appellants' argument that §5 should be read in parallel with the Fifteenth Amendment would fail for the simple reason that we have never held that vote dilution violates the Fifteenth Amendment. See *Voinovich* v. *Quilter*, 507 U. S. 146, 159 (1993) (citing *Beer* v. *United States*, 425 U. S. 130, 142–143, n. 14 (1976)). Indeed, contrary to JUSTICE SOUTER's assertion, *post*, at 360, n. 11 (opinion concurring in part and dissenting in part), we have never even "suggested" as much. *Gomillion* v. *Lightfoot*, 364 U. S. 339 (1960), involved a proposal to redraw the boundaries of Tuskegee, Alabama, so as to exclude all but 4 or 5 of its 400 black voters without excluding a single white voter. See *id.*, at 341. Our conclusion that the proposal would deny black voters the right to vote in municipal elections, and therefore violated the Fifteenth Amendment, had nothing to do with racial vote dilution, a concept that does not appear in

In another argument that applies equally to our holding in *Beer*, appellants object that our reading of § 5 would require the District Court or Attorney General to preclear proposed voting changes with a discriminatory effect or purpose, or even with both. That strikes appellants as an inconceivable prospect only because they refuse to accept the limited meaning that we have said preclearance has in the vote-dilution context. It does *not* represent approval of the voting change; it is nothing more than a determination that the voting change is no more dilutive than what it replaces, and therefore cannot be stopped in advance under the extraordinary burden-shifting procedures of § 5, but must be attacked through the normal means of a § 2 action. As we have repeatedly noted, in vote-dilution cases § 5 prevents nothing but backsliding, and preclearance under § 5 affirms nothing but the absence of backsliding. *Bossier Parish I*, 520 U. S., at 478; *Miller* v. *Johnson*, 515 U. S. 900, 926 (1995); *Beer*, 425 U. S., at 141.[4] This explains why the

our voting-rights opinions until nine years later. See *Allen* v. *State Bd. of Elections*, 393 U. S. 544, 569 (1969). As for the other case relied upon by JUSTICE SOUTER, the plurality opinion in *Mobile* v. *Bolden*, 446 U. S. 55 (1980), not only does that not suggest that the Fifteenth Amendment covers vote dilution, it suggests the opposite, rejecting the appellees' vote-dilution claim in the following terms: "The answer to the appellees' argument is that . . . their freedom to vote has not been denied or abridged by anyone. The Fifteenth Amendment does not entail the right to have Negro candidates elected . . . . Having found that Negroes in Mobile 'register and vote without hindrance,' the District Court and Court of Appeals were in error in believing that the appellants invaded the protection of that Amendment in the present case." *Id.*, at 65; see also *id.*, at 84, n. 3 (STEVENS, J., concurring in judgment) (characterizing plurality opinion as concluding that "the Fifteenth Amendment applies only to practices that directly affect access to the ballot").

[4] In search of support for the argument that § 5 prevents not just backsliding on vote dilution but all forms of vote dilution, JUSTICE SOUTER embarks upon a lengthy expedition into legislative history. *Post*, at 362–367 (opinion concurring in part and dissenting in part). He returns emptyhanded, since he can point to nothing suggesting that the Congress thought § 5 covered both retrogressive and nonretrogressive *dilution*. Indeed, it is doubtful whether the Congress that passed the 1965 Voting

sole consequence of failing to obtain preclearance is continuation of the status quo. To deny preclearance to a plan that is *not* retrogressive—*no matter how unconstitutional it may be*—would risk leaving in effect a status quo that is even worse. For example, in the case of a voting change with a discriminatory but nonretrogressive purpose and a discriminatory but ameliorative effect, the result of denying preclearance would be to preserve a status quo with more discriminatory effect than the proposed change.

In sum, by suggesting that §5 extends to discriminatory but nonretrogressive vote-dilutive purposes, appellants ask us to do what we declined to do in *Bossier Parish I:* to blur the distinction between §2 and §5 by "shift[ing] the focus of §5 from nonretrogression to vote dilution, and . . . chang[ing] the §5 benchmark from a jurisdiction's existing plan to a hypothetical, undiluted plan." 520 U. S., at 480. Such a reading would also exacerbate the "substantial" federalism costs that the preclearance procedure already exacts, *Lopez* v. *Monterey County,* 525 U. S. 266, 282 (1999), perhaps to the extent of raising concerns about §5's constitutionality, see *Miller, supra,* at 926–927. Most importantly, however, in light of our holding in *Beer,* appellants' reading finds no support in the language of §5.[5]

---

Rights Act even had the practice of racial vote dilution in mind. As JUSTICE SOUTER acknowledges, this Court did not address the concept until 1969, see *post,* at 364, n. 13, and the legislative history of the 1969 extension of the Act, quoted by JUSTICE SOUTER, see *post,* at 364–365, refers to at-large elections and consolidation of counties as "new, unlawful ways to diminish the Negroes' franchise" developed since passage of the Act. H. R. Rep. No. 91–397, pp. 6–7 (1969).

[5] JUSTICE SOUTER asserts that "[t]he Justice Department's longstanding practice of refusing to preclear changes that it determined to have an unconstitutionally discriminatory purpose, both before and after *Beer,*" is entitled to deference. *Post,* at 368 (opinion concurring in part and dissenting in part); accord, *post,* at 373 (STEVENS, J., dissenting). But of course before *Beer* the Justice Department took the position that even the *effects* prong was not limited, in redistricting cases, to retrogression. Indeed, that position had been the basis for its denial of preclearance in

## IV

Notwithstanding the fact that *Bossier Parish I* explicitly "le[ft] open for another day" the question whether §5 extends to discriminatory but nonretrogressive intent, see 520 U. S., at 486, appellants contend that two of this Court's prior decisions have already reached the conclusion that it does. First, appellants note that, in *Beer*, this Court stated that "an ameliorative new legislative apportionment cannot violate §5 unless the new apportionment itself so discriminates on the basis of race or color as to violate the Constitution." 425 U. S., at 141. Appellants contend that this suggests that, at least in some cases in which the covered jurisdiction acts with a discriminatory but nonretrogressive dilutive purpose, the covered jurisdiction should be denied preclearance because it is acting unconstitutionally.

We think that a most implausible interpretation. At the time *Beer* was decided, it had not been established that discriminatory purpose as well as discriminatory effect was necessary for a constitutional violation, compare *White* v. *Regester*, 412 U. S. 755, 765–766 (1973), with *Washington* v. *Davis*, 426 U. S. 229, 238–245 (1976). If the statement in *Beer* had meant what appellants suggest, it would either have been anticipating (without argument) that later holding, or else would have been gutting *Beer*'s holding (since a showing of discriminatory but nonretrogressive effect *would* have been a constitutional violation and *would*, despite the holding of *Beer*, have sufficed to deny preclearance). A much more plausible explanation of the statement is that it referred to a constitutional violation *other than* vote dilu-

---

*Beer*, see 425 U. S., at 136, and was argued in its brief before us as the basis for sustaining the District Court's denial, see Brief for United States in *Beer* v. *United States*, O. T. 1975, No. 73–1869, pp. 17–18. We rejected that position as to the effects prong, and there is even more reason to reject it in the present cases, whose outcomes depend as much upon the implication of one of our prior cases (as to which we owe the Department no deference) as upon a raw interpretation of the statute.

tion—and, more specifically, a violation consisting of a "denial" of the right to vote, rather than an "abridgement." Although in the context of denial claims, no less than in the context of abridgment claims, the antibacksliding rationale for § 5 (and its effect of avoiding preservation of an even worse status quo) suggests that retrogression should again be the criterion, arguably in that context the word "deny" (unlike the word "abridge") does not import a comparison with the status quo.[6]

In any event, it is entirely clear that the statement in *Beer* was pure dictum: The Government had made no contention that the proposed reapportionment at issue was unconstitutional. 425 U. S., at 142, n. 14. And though we have quoted the dictum in subsequent cases, we have never actually applied it to deny preclearance. See *Bossier Parish I, supra,* at 481; *Shaw* v. *Hunt,* 517 U. S. 899, 912 (1996) *(Shaw II); Miller,* 515 U. S., at 924. We have made clear, on the other hand, what we reaffirm today: that proceedings to preclear apportionment schemes and proceedings to consider the constitutionality of apportionment schemes are entirely distinct.

> "Although the Court concluded that the redistricting scheme at issue in *Beer* was nonretrogressive, it

---

[6] JUSTICE BREYER suggests that "[i]t seems obvious . . . that if Mississippi had enacted its 'moral character' requirement in 1966 (after enactment of the Voting Rights Act), a court applying § 5 would have found 'the purpose . . . of denying or abridging the right to vote on account of race,' even if Mississippi had intended to permit, say, 0.4%, rather than 0.3%, of the black voting age population of Forrest County to register." *Post,* at 376 (dissenting opinion). As we note above, however, our holding today does not extend to violations consisting of an outright "denial" of an individual's right to vote, as opposed to an "abridgement" as in dilution cases. In any event, if Mississippi had attempted to enact a "moral character" requirement in 1966, it would have been precluded from doing so under § 4, which bars certain types of voting tests and devices altogether, and the issue of § 5 preclearance would therefore never have arisen. See 42 U. S. C. §§ 1973b(a)(1), (c).

did not hold that the plan, for that reason, was immune from constitutional challenge. . . . Indeed, the Voting Rights Act and our case law make clear that a reapportionment plan *that satisfies §5* still may be enjoined as unconstitutional." *Shaw* v. *Reno,* 509 U. S. 630, 654 (1993) *(Shaw I)* (emphasis added).

See also *City of Lockhart* v. *United States,* 460 U. S. 125, 134 (1983) (describing the holding of *Beer* as follows: "Although the new plan may have remained discriminatory, it nevertheless was not a regressive change. . . . Since the new plan did not increase the degree of discrimination against blacks, it was entitled to §5 preclearance"); *Allen* v. *State Bd. of Elections,* 393 U. S. 544, 549–550 (1969) ("Once the State has successfully complied with the §5 approval requirements, private parties may enjoin the enforcement of the new enactment only in traditional suits attacking its constitutionality . . ."). As we noted in *Shaw I,* §5 explicitly states that neither administrative nor judicial preclearance "'shall bar a subsequent action to enjoin enforcement' of [a change in voting practice]." 509 U. S., at 654 (quoting 42 U. S. C. § 1973c). That fully available remedy leaves us untroubled by the possibility that §5 could produce preclearance of an unconstitutionally dilutive redistricting plan.

Second, appellants contend that we denied preclearance on the basis of a discriminatory but nonretrogressive purpose in *Pleasant Grove* v. *United States,* 479 U. S. 462 (1987). That case involved an unusual fact pattern. The city of Pleasant Grove, Alabama—which, at the time of the District Court's decision, had 32 black inhabitants, none of whom was registered to vote and of whose existence city officials appear to have been unaware, *id.,* at 465, n. 2— sought to annex two parcels of land, one inhabited by a few whites, and the other vacant but likely to be inhabited by whites in the near future. We upheld the District Court's conclusion that the city acted with a discriminatory purpose in annexing the land, rejecting the city's contention

that it could not have done so because it was unaware of the existence of any black voters against whom it could have intended to discriminate:

> "[The city's] argument is based on the incorrect assumption that an impermissible purpose under §5 can relate only to present circumstances. Section 5 looks not only to the present effects of changes, but to their future effects as well .... Likewise, an impermissible purpose under §5 may relate to anticipated as well as present circumstances.
>
> "It is quite plausible to see [the annexation] as motivated, in part, by the impermissible purpose of minimizing future black voting strength. . . . This is just as impermissible a purpose as the dilution of present black voting strength." *Id.*, at 471–472 (citations and footnotes omitted).

Appellants assert that we must have viewed the city's purpose as discriminatory but nonretrogressive because, as the city noted in contending that it lacked even a discriminatory purpose, the city could not have been acting to worsen the voting strength of any present black residents, since there were no black voters at the time. However, as the above quoted passage suggests, we did not hold that the purpose prong of §5 extends beyond retrogression, but rather held that a jurisdiction with no minority voters can have a retrogressive purpose, at the present time, by intending to worsen the voting strength of *future* minority voters. Put another way, our holding in *Pleasant Grove* had nothing to do with the question whether, to justify the denial of preclearance on the basis of the purpose prong, the purpose must be retrogressive; instead, it involved the question whether the purpose must be to achieve retrogression at once or could include, in the case of a jurisdiction with no present minority voters, retrogression with regard to operation of the proposed plan (as compared with

operation of the status quo) against new minority voters in the future. Like the dictum from *Beer*, therefore, *Pleasant Grove* is simply inapposite here.

\*　　\*　　\*

In light of the language of § 5 and our prior holding in *Beer*, we hold that § 5 does not prohibit preclearance of a redistricting plan enacted with a discriminatory but non-retrogressive purpose. Accordingly, the judgment of the District Court is affirmed.

*It is so ordered.*

JUSTICE THOMAS, concurring.

The Bossier Parish School Board first sought preclearance of the redistricting plan at issue in this litigation almost seven years ago. The Justice Department and private appellants opposed that effort, arguing throughout this litigation that a "safe" majority-minority district is necessary to ensure the election of a black school board member. Ironically, while this litigation was pending, three blacks were elected from majority-white districts to serve on the Bossier Parish School Board. Although these election results are not part of the record, they vividly illustrate the fact that the federal intervention that spawned this litigation was unnecessary.

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, concurring in part and dissenting in part.

Under § 5 of the Voting Rights Act of 1965, 42 U. S. C. § 1973c, a jurisdiction required to obtain preclearance of changes to its voting laws must show that a proposed amendment will not have the effect, and does not reflect a purpose, to deny or abridge the vote on account of race. I respectfully dissent[1] from the Court's holding that § 5 is indifferent

---

[1] I agree with the Court's conclusion on the matter of mootness.

to a racially discriminatory purpose so long as a change in voting law is not meant to diminish minority voting strength below its existing level. It is true that today's decision has a precursor of sorts in *Beer* v. *United States*, 425 U. S. 130 (1976), which holds that the only anticipated redistricting effect sufficient to bar preclearance is retrogression in minority voting strength, however dilutive of minority voting power a redistricting plan may otherwise be. But if today's decision achieves a symmetry with *Beer*, the achievement is merely one of well-matched error. The Court was mistaken in *Beer* when it restricted the effect prong of § 5 to retrogression, and the Court is even more wrong today when it limits the clear text of § 5 to the corresponding retrogressive purpose. Although I adhere to the strong policy of respecting precedent in statutory interpretation and so would not reexamine *Beer*, that policy does not demand that recognized error be compounded indefinitely, and the Court's prior mistake about the meaning of the effects requirement of § 5 should not be expanded by an even more erroneous interpretation of the scope of the section's purpose prong.

The Court's determination that Congress intended preclearance of a plan not shown to be free of dilutive intent (let alone a plan shown to be intentionally discriminatory) is not, however, merely erroneous. It is also highly unconvincing. The evidence in these very cases shows that the Bossier Parish School Board (School Board or Board) acted with intent to dilute the black vote, just as it acted with that same intent through decades of resistance to a judicial desegregation order. The record illustrates exactly the sort of relentless bad faith on the part of majority-white voters in covered jurisdictions that led to the enactment of § 5. The evidence all but poses the question why Congress would ever have meant to permit preclearance of such a plan, and it all but invites the answer that Congress could hardly have intended any such thing. While the evidence goes substantially unnoticed on the Court's narrow reading of the purpose

prong of §5, it is not only crucial to my resolution of these cases, but insistent in the way it points up the implausibility of the Court's reading of purpose under §5.

I

In *Arlington Heights* v. *Metropolitan Housing Development Corp.*, 429 U. S. 252 (1977), this Court set out a checklist of considerations for assessing evidence going to discriminatory intent: the historical background of a challenged decision, its relative impact on minorities, specific antecedent events, departures from normal procedures, and contemporary statements of decisionmakers. *Id.*, at 266–268. We directed the District Court to follow that checklist in enquiring into discriminatory intent following remand in these cases, *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 488 (1997) *(Bossier Parish I)*. The *Arlington Heights* enquiry reveals the following account of the School Board's redistricting activity and of the character of the parish in which it occurred.

The parish's institution of general governance is known as the Police Jury, a board of representatives chosen from districts within the parish. After the 1990 census showed a numerical malapportionment among those districts, the Police Jurors prepared a revised districting plan, which they submitted to the Attorney General of the United States with a request for the preclearance necessary under §5 of the Voting Rights Act before the parish, a covered jurisdiction, could modify its voting district lines. Based on information then available to the Department of Justice, the Attorney General understood the parish to have shown that the new plan would not have the effect and did not have the purpose of abridging the voting rights of the parish's 20% black population, and the revised Police Jury plan received preclearance in the summer of 1991. In fact, as the parish's School Board has now admitted, the Police Jury plan thus approved dilutes the voting strength of the minority popula-

tion, Plaintiff's Brief on Remand 12; that is, the plan discriminates by abridging the rights of minority voters to participate in the political process and elect candidates of their choice. *Thornburg* v. *Gingles*, 478 U. S. 30, 46–47 (1986).

The same population shifts that required the Police Jury to reapportion required the elected School Board to do the same. Although the Board had approached the Police Jury about the possibility of devising a joint plan of districts common to both Board and jury, the jury rebuffed the Board, see App. to Juris. Statement 172a (Stipulations 83–84), and the Board was forced to go it alone. History provides a good indication of what might have been expected from this endeavor.

As the parties have stipulated, the School Board had applied its energies for decades in an effort to "limit or evade" its obligation to desegregate the parish schools. *Id.*, at 216a (Stipulation 237). When the Board first received a court order to desegregate the parish's schools in the mid-1960's, it responded with the flagrantly defiant tactics of that era, see *id.*, at 216a–217a (Stipulations 236–237), and the record discloses the Board's continuing obstructiveness down to the time covered by these cases. During the 1980's, the degree of racial polarization in the makeup of the parish's schools rose, *id.*, at 218a (Stipulations 241–243), and the disproportionate assignment of black faculty to predominantly black schools increased, *id.*, at 217a–218a (Stipulation 240). While the parish's superintendent testified that the assignment of black faculty to predominantly black schools came in response to black parents' requests for positive black examples for their children, see App. 289, the black leaders who testified in these cases uniformly rejected that claim and insisted that, in accord with the parish's desegregation decree, black faculty were to be distributed throughout the parish's schools, to serve as models for white, as well as black, students, see *id.*, at 326–327; 2 Tr. 126–128.

Other evidence of the Board's intransigence on race centers on the particular terms of the integration decree that since 1970 has required the Board to maintain a "Bi-Racial Advisory Review Committee" made up of an equal number of black and white members in order to "'recommend to the . . . Board ways to attain and maintain a unitary system and to improve education in the parish.'" App. to Juris. Statement in No. 98–405, p. 182a (Stipulation 111) (hereinafter App. to Juris. Statement). Although the Board represented to the District Court overseeing desegregation that the committee was in place, see 2 Tr. 16 (testimony of Superintendent William T. Lewis), the committee actually met only two or three times in the mid-1970's and then with only its black members in attendance, see App. to Juris. Statement 183a (Stipulation 112). In 1993, the Board set up a short-lived "Community Affairs Committee" to replace the "Bi-Racial Committee." Despite the Board's resolution charging the committee "'with the responsibility of investigating, consulting and advising the court and school board periodically with respect to all matters pertinent to the retention [sic] of a unitary school system,'" ibid. (Stipulation 114), the Board disbanded the committee after only three months because, as a leading Board member put it, "'the tone of the committee made up of the minority members of the committee quickly turned toward becoming involved in policy,'" id., at 184a (Stipulation 116). "Policy," however, was inevitably implicated by the committee's purpose, and the subjects of its recommendations (such as methods for more effective recruitment of black teachers and their placement throughout the school system in accord with the terms of the desegregation decree, see id., at 183a–184a (Stipulation 115)) fell squarely within its mandate. It is thus unsurprising that the Board has not achieved a unitary school system and remains under court order to this day. See id., at 217a (Stipulation 239); App. 139 (testimony of S. P. Davis).

About the time the Board appointed its "Community Affairs Committee," it sought preclearance under § 5 from the Attorney General for the redistricting plan before us now. The course of the Board's redistricting efforts tell us much about what it had in mind when it proposed its plan. Following the rebuff from the Police Jury, the Board was able to follow a relaxed redistricting timetable, there being no Board elections scheduled before 1994. While the Board could simply have adopted the Police Jury plan once the Attorney General had precleared it, the Board did not do so, App. to Juris. Statement 147a (Stipulation 11), despite just such a proposal from one Board member at the Board's September 5, 1991, meeting. No action was then taken on the proposal, id., at 174a (Stipulations 89–90), and although the Board issued no explanation for its inaction, it is noteworthy that the jury plan ignored some of the Board's customary districting concerns. Whereas one of those concerns was incumbency protection, see App. 251; cf. App. to Juris. Statement 152a (Stipulation 26), the jury plan would have pitted two pairs of incumbents against each other and created two districts in which no incumbent resided, id., at 181a–182a (Stipulation 109).[2] The jury plan disregarded school attendance zones, and even included two districts containing no schools. Id., at 174a, 151a, 191a (Stipulations 88, 24, 141). The jury plan, moreover, called for a total variation in district populations exceeding the standard normally used to gauge satisfaction of the "one person, one vote" principle, see id., at 162a–163a (Stipulation 58); App. 231–232; 1 Tr. 147, four of its districts failed the standard measure of compactness used by the Board's own cartographer, id., at 174–176,

---

[2] While two of the incumbents were considering stepping down by the time the Board subsequently adopted the plan, at least one of those decisions was anything but firm. See App. 103; 4 Record, Doc. No. 72, in Civ. Action No. 94–1495 (D. D. C.), pp. 60–61 (joint designations of portions of deposition of David Harvey); 1 Tr. 85.

and one of its districts contained noncontiguous elements, App. 234–235.

In addressing the need to devise a plan of its own, the Board hired the same redistricting consultant who had advised the Police Jury, Gary Joiner. Joiner and the Board members (according to Joiner's testimony) were perfectly aware of their responsibility to avoid vote dilution in accordance with the Voting Rights Act, see Record, Doc. No. 38 (direct testimony of Joiner 5), and he estimated that it would take him between 200 to 250 hours to devise a plan for the Board. The Board then spent nearly a year doing little in public about redistricting, while its members met in private with Joiner to consider alternatives. In March 1992, George Price, president of the parish's branch of the National Association for the Advancement of Colored People (NAACP), wrote to the superintendent of parish schools asking for a chance to play some role in the redistricting process. App. 184. Although the superintendent passed the letter on to the Board, the Board took no action, and neither the superintendent nor the Board even responded to Price's request. App. to Juris. Statement 175a (Stipulation 93). In August, Price wrote again, this time in concert with a number of leaders of black community organizations, again seeking an opportunity to express views about the redistricting process, as well as about a number of Board policies bearing on school desegregation. App. 187–189; see also App. to Juris. Statement 175a (Stipulation 94). Once again the Board made no response.

Being frustrated by the Board's lack of responsiveness, Price then asked for help from the national NAACP's Redistricting Project, which sent him a map showing how two compact majority-black districts might be drawn in the parish. *Id.*, at 177a (Stipulation 98). When Price showed the map to a school district official, he was told it was unacceptable because it failed to show all 12 districts. At Price's request, the Redistricting Project then provided a

plan showing all 12 districts, which Price presented to the Board at its September 3, 1992, meeting, explaining that it showed the possibility of drawing majority-black districts. *Id.*, at 177a–178a (Stipulations 99–100). Several Board members said they could not consider the NAACP plan unless it was presented on a larger map, *id.*, at 178a (Stipulation 100), and both the Board's cartographer and its legal advisor, the parish district attorney, dismissed the plan out of hand because it required precinct splits, *id.*, at 179a (Stipulation 102).

There is evidence that other implications of the NAACP proposal were objectionable to the Board. According to one black leader, Board member Henry Burns told him that while he personally favored black representation on the Board, a number of other Board members opposed the idea.[3] App. 142. According to George Price, Board member Barry Musgrove told him that the Board was hostile to the creation of a majority-black district. *Id.*, at 182.[4]

Although the NAACP plan received no further public consideration, the pace of public redistricting activity suddenly speeded up. At the Board's September 17, 1992, meeting, without asking Joiner to address the possibility of creating any majority-black district, the Board abruptly passed a statement of intent to adopt the Police Jury plan. App. to Juris. Statement 179a–180a (Stipulation 106). At a public

---

[3] One other Board member, Marguerite Hudson, when asked to explain why two of the schools in Plain Dealing, one of the parish's towns, were predominantly black, stated: "[T]hose people love to live in Plain Dealing. . . . And most of them don't want to get a big job, they would just rather stay out there in the country, and stay on Welfare, and stay in Plain Dealing." App. 118.

[4] Musgrove denied making the statement. See 1 Tr. 56. If, as the District Court majority suggested, the significance of the latter statement is uncertain, see *Bossier Parish School Bd.* v. *Reno*, 907 F. Supp. 434, 448 (DC 1995) *(Bossier Parish I)*, it was tantamount to opposition to the most obvious cure for the admitted dilution; there was in any event nothing ambiguous about the Burns statement.

hearing on the plan one week later, attended by an overflow crowd, a number of black voters spoke against the plan, and Price presented the Board with a petition bearing over 500 signatures urging consideration of minority concerns. No one spoke in favor of the plan, *Bossier Parish I*, 907 F. Supp. 434, 439 (DC 1995), and Price explained to the Board that preclearance of the jury plan for use by the Police Jury was no guarantee of preclearance of the same plan for the Board. App. to Juris. Statement 180a–181a (Stipulation 108). Nonetheless, at its October 1 meeting, the voting members of the Board unanimously adopted the Police Jury plan, with one member absent and the Board's only black member (who had been appointed just two weeks earlier to fill a vacancy) abstaining. *Id.*, at 181a–182a (Stipulation 109). The Board did not submit the plan for preclearance by the Attorney General until January 4, 1993. *Id.*, at 182a (Stipulation 110).

## II

The significance of the record under § 5 is enhanced by examining in more detail several matters already mentioned as free from dispute, by testing some of the Board's stated reasons for refusing to consider any NAACP plan, and by looking critically at the District Court's reasons for resolving disputed issues in the School Board's favor.

## A

The parties stipulate that for decades before this redistricting the Board had sought to "limit or evade" its obligation to end segregation in its schools, an obligation specifically imposed by Court order nearly 35 years ago and not yet fulfilled. The Board has also conceded the discriminatory impact of the Police Jury plan in falling "more heavily on blacks than on whites," Plaintiff's Brief on Remand in Civ. Action No. 94–1495 (D. D. C.), p. 12, and in diluting "black voting strength," *id.*, at 21. Even without the stipulated history, the conceded dilution would be evidence of a corre-

spondingly discriminatory intent. With the history, the implication of intent speaks louder, and it grows more forceful still after a closer look at two aspects of the dilutive impact of the Police Jury plan.

First, the plan includes no majority-black districts even though residential and voting patterns in Bossier Parish meet the three conditions we identified in *Thornburg* v. *Gingles*, 478 U. S., at 50–51, as opening the door to drawing majority-minority districts to put minority voters on an equal footing with others. The first *Gingles* condition is that "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.*, at 50. The Board does not dispute that black voters in Bossier Parish satisfy this criterion. The Board joined in a stipulation of the parties that in 1991, "it was obvious that a reasonably compact black-majority district could be drawn within Bossier City," App. to Juris. Statement 154a–155a (Stipulation 36); see also 1 Tr. 60 (statement of Board member Barry Musgrove), and that the NAACP plan demonstrated that two such districts could have been drawn in the parish, see App. to Juris. Statement 192a (Stipulation 143).[5] As to the second and third *Gingles* conditions, that the minority population be politically cohesive and that the majority-white block voting be enough to defeat the minority's preferred candidate, see *Gingles, supra,* at 51, the Government introduced expert testimony showing such polarization in Bossier Parish's voting patterns. See App. to Juris. Statement 201a–

---

[5] While the cartographer hired by the Board stated during the redistricting process that the parish's black population was too dispersed to draw a majority-black district, he later acknowledged that in fact two such districts could be drawn, see App. to Juris. Statement 160a–161a (Stipulations 52, 53), and not only the original NAACP plans but also the Cooper Plans, two alternative plans developed by an expert for the defendant-intervenors, demonstrated as much, see App. 238 (Cooper Plans); App. to Juris. Statement 193a (Stipulation 147).

207a (Stipulations 181–196); App. 163–173 (declaration of Dr. Richard Engstrom). While acknowledging the somewhat limited data available for analysis, the expert concluded that "African American voters are likely to have a realistic opportunity to elect candidates of their choice to the . . . Board only in districts in which they constitute a majority of the voting age population." *Id.*, at 174.[6]

Second, the Police Jury plan diluted black votes by dividing neighboring black communities with common interests in and around at least two of the Parish's municipalities, thereby avoiding the creation of a majority-black district.[7] See *id.*, at 154–156 (declaration of George J. Castille III); *id.*, at 141 (testimony of S. P. Davis). Even the Board's own cartographer conceded that one of these instances " 'appear[ed]' " to constitute " 'fracturing,' " App. to Juris. Statement 191a (Stipulation 138), which he defined as "divid[ing] a 'population that has a traditional cohesiveness, lives in the same general area, [and] has a lot of commonalties' . . . with '[the] intent to . . . fracture that population into adjoining white districts,' " *id.*, at 189a–190a (Stipulation 133).

---

[6] The parties agreed that black candidates for other offices have been able to win from majority-white districts in the parish, see *id.*, at 201a (Stipulation 180), but those instances all involved districts in which the presence of an Air Force base, see *id.*, at 206a–207a (Stipulation 196), meant both that the effective percentage of black voters was considerably higher than the raw figures suggested and, in the view of all the successful black candidates, that the degree of hostility to black candidates among white voters was lower than in the rest of the parish, see App. 131–132 (statement of Jeff Darby), 133–134 (statement of Jerome Darby), 143–144 (statement of Johnny Gipson).

[7] Counsel for the Board suggested in cross-examining one of the Government's experts that one of the instances of dividing black communities arose from a state-law prohibition on the Board's "split[ting] existing corporate lines." 2 Tr. 189. He offered no authority for that proposition. But in any case, the example the expert gave did not involve dividing a municipality, but including in a single district areas both within the municipality and outside it.

B

The Board's cartographer and lawyer objected that the NAACP plan was unacceptable because it split precincts in violation of state law. And yet the Board concedes that school boards were free to seek precinct changes from the police juries of their parishes, as they often successfully did. See *id.*, at 150a–151a (Stipulations 22–23). One of the Government's experts, see App. 214, 217, 354, and the Board's own cartographic consultant, see App. to Juris. Statement 151a (Stipulation 23), acknowledged this practice. Indeed, the parties agree that Joiner advised the Board about the option of going to the Police Jury for precinct changes, see *id.*, at 174a (Stipulation 89); see also *id.*, at 179a (Stipulation 102), but that the Board never asked him to pursue that possibility, see *id.*, at 188a (Stipulation 128).[8] Judge Kessler in the District Court was therefore surely correct that the Board's claimed inability to divide precincts was no genuine obstacle to a plan with a majority-black district. See *Bossier Parish I*, 907 F. Supp., at 460–461 (opinion concurring in part and dissenting in part).

_____

[8] The District Court majority stated that it was not merely the fact that the NAACP plan required precinct splits, but that it required a large number of splits that made it unappealing. This claim is untenable for several reasons. First, again it assumes that the act to be explained is the rejection of the NAACP plan rather than the adoption of the Police Jury plan. While the NAACP plan required 46 precinct splits, see App. to Juris. Statement 194a–195a (Stipulation 151), the Cooper II plan, which also included two majority-black districts meeting traditional districting criteria, required only 27, *ibid.*, and the establishment of a single majority-black district would have required just 14, see App. 269–270, 277. Second, and more importantly, the Board's cartographer and lawyer stated that they told the Board the NAACP plan was unacceptable because it split any precincts at all, not because it split lots of them, see App. to Juris. Statement 179a (Stipulation 102), and a leading supporter of the Police Jury plan on the Board, see 1 Tr. 129, and the Board's interim black member at the time of redistricting, see App. 130, agree on that score.

It becomes all the clearer that the prospect of splitting precincts was no genuine reason to reject the NAACP plan (or otherwise to refuse to consider creating any majority-black districts) when one realizes that from early on in the Board's redistricting process it gave serious thought to adopting a plan that would have required just such precinct splits. When the Board hired Joiner as its cartographer in May 1991, his estimate of 200 to 250 hours to prepare a plan for the Board, see App. to Juris. Statement 173a (Stipulation 86), indicated that there was no intent simply to borrow the recently devised Police Jury plan or to build on the precincts established by the Police Jury, a possibility that Joiner thought could be explored in "[s]everal hours at least," App. 271. It seems obvious that from the start the Board expected its plan to require precinct splitting, and Joiner acknowledged in his testimony that any plan "as strong as" the Police Jury plan in terms of traditional districting criteria would require precinct splits. *Ibid.* Splitting precincts only became an insuperable obstacle once the NAACP made its proposal to create majority-black districts.

## C

### 1

Despite its stated view that the record would not support a conclusion of nonretrogressive discriminatory intent, the District Court majority listed a series of "allegedly dilutive impacts" said to point to discriminatory intent: "[t]hat some of the new districts have no schools, that the plan ignores attendance boundaries, that it does not respect communities of interest, that there is one outlandishly large district, that several of them are not compact, that there is a lack of contiguity, and that the population deviations resulting from the jury plan are greater than the limits (±5%) imposed by Louisiana law." 7 F. Supp. 2d 29, 32 (DC 1998) *(Bossier Parish II)*. The District Court found this evidence

"too theoretical, and too attenuated," to be probative of retrogressive intent in the absence of corroborating evidence of a "deliberate attempt." *Ibid.* But whatever the force of such evidence may be on the issue of intent to cause retrogression, there is nothing "theoretical" or "attenuated" in its significance as showing intent to dilute generally.

## 2

If we take the District Court opinions in *Bossier Parish I* and *Bossier Parish II* together and treat the court's § 5 discussions as covering nonretrogressive discriminatory intent, it is clear that the court rested on two reasons for finding that the plan's dilutive effect could not support an inference of nonretrogressive discriminatory intent. First, the court thought any such inference inconsistent with the view expressed in *Miller* v. *Johnson,* 515 U.S. 900, 924 (1995), that a refusal to adopt a plan to maximize the number of majority-minority districts is insufficient alone to support an inference of intentional discrimination. *Miller* is not on point, however. In *Miller,* Georgia had already adopted a plan that clearly improved the position of minority voters by establishing two majority-black districts. The question was simply whether the State's refusal to create a third betrayed discriminatory intent. *Id.,* at 906–908, 923–924. In these cases, the issue of inferred intent did not arise upon rejection of a plan maximizing the number of majority-black districts after a concededly ameliorative plan had already been adopted; the issue arose on the Board's refusal to consider a plan with any majority-black districts when more than one such district was possible under *Gingles.* The issue here is not whether Bossier Parish betrayed a discriminatory purpose in refusing to create the maximum number of majority-black districts, see *Bossier Parish II, supra,* at 33 (Silberman, J., concurring), but simply whether it was significant that the parish refused to consider creating a majority-black district at all. The refusal points to a dis-

criminatory intent that the refusal to maximize in *Miller* v. *Johnson* did not show.

The District Court's second ground for discounting the evidence of intent inherent in the Police Jury plan's dilutive effect was its finding that the Board had legitimate, nondiscriminatory reasons for approving the plan. The evidence, however, is powerful in showing that the Board had no such reasons. As I have already noted, the Board's respect for existing precinct lines was apparently pretextual. The other supposedly legitimate reason for the Board's choice, that the Police Jury was a safe harbor under §5, is equally unlikely. If the Police Jury plan was a safe harbor, it had been safe from the day the Attorney General precleared it for the Police Jury, whereas the Board ignored it for more than a year after that preclearance. Interest in the Police Jury plan developed only after pressure from Price and the NAACP had intensified to the point that the redistricting process would have to be concluded promptly if the minority proposals were not to be considered. The Police Jury, therefore, became an attractive harbor only when it seemed to offer safety from demands for a fair reflection of minority voting strength. It was chosen by a Board, described by the District Court majority as possessing a "tenacious determination to maintain the status quo," *Bossier Parish II*, *supra*, at 32, and the only fair inference is that when the Board suddenly embraced the Police Jury plan it was running true to form.[9]

---

[9] My conclusion indicates my disagreement with JUSTICE THOMAS's concurring opinion. The factual predicate for raising and resolving the issue of the scope of discriminatory intent relevant under §5 is a subject of the Board's obligation to produce evidence and the District Court's obligation to make findings, and nothing in the conduct of the Justice Department has impeded either the Board or the court from addressing this evidentiary issue. The fact that black members have been elected to the Board is outside the record and is no more before us than evidence showing the extent to which the particular members were the choices of the minority voters who have suffered the conceded dilution.

## D

In sum, for decades the School Board manifested sedulous resistance to the constitutional obligation to desegregate parish schools, which have never attained unitary status and are still subject to court order. When faced with the need to act alone in redrawing its voting districts, the Board showed no interest in the Police Jury plan, which made no sense for school purposes and was at odds with normal districting principles applied by the Board. The Board hired a cartographer in anticipation of drawing district lines significantly different from the Police Jury lines, and the Attorney General's preclearance of the Police Jury plan for the jury's use produced no apparent Board interest in adopting that same plan. When minority leaders sought a role in proposing a plan, the Board ignored them and when they produced concrete proposals prepared by the NAACP, the Board sidestepped with successive technical reasons culminating in a patently pretextual objection. It was only then, as its pretexts for resisting the NAACP were wearing thin, that the Board evidently scrapped its intention to obtain an original plan tailored to school district concerns and acted with unwonted haste on the year-old proposal to adopt the manifestly unsuitable Police Jury plan. The proposal received no public hearing support and nothing but objection from minority voters, who pointed out what the Board now agrees, that the Police Jury plan dilutes minority voting strength. The objections were unavailing and the Board adopted the dilutive plan.

There is no reasonable doubt on this record that the Board chose the Police Jury plan for no other reason than to squelch requests to adopt the NAACP plan or any other plan reflecting minority voting strength, and it would be incredible to suggest that the resulting submergence of the minority voters was unintended by the Board whose own expert testified that it understood the illegality of dilution. If, as I conclude below, see Part III, *infra*, dilutive but nonretrogressive in-

tent behind a redistricting plan disqualifies it from § 5 preclearance, then preclearance is impossible on this record. Since the burden to negate such intent (like the burden to negate retrogressive intent and effect) rests on the voting district asking for preclearance, nothing more is required to show the impossibility of preclearance. See, *e. g., Pleasant Grove* v. *United States*, 479 U. S. 462, 469 (1987). It is worth noting, however, that the parish should likewise lose even if we assume, as the District Court majority seems to have done at one point, that the burden to show disqualifying intent is on the Government and the intervenors. *Bossier Parish II*, 7 F. Supp. 2d, at 31 ("We can imagine a set of facts that would establish a 'non-retrogressive, but nevertheless discriminatory purpose,' but those imagined facts are not present here"). It is not only that Judge Kessler was correct in her conclusion that dilutive but nonretrogressive intent was shown; the contrary view of the District Court majority raises " 'the definite and firm conviction that a mistake [has] been committed,' " *Concrete Pipe & Products of Cal., Inc.* v. *Construction Laborers Pension Trust for Southern Cal.*, 508 U. S. 602, 622 (1993) (quoting *United States* v. *United States Gypsum Co.*, 333 U. S. 364, 395 (1948)). Regardless of the burden of persuasion, therefore, the parish should lose under the intent prong of § 5, if the purpose that disqualifies under § 5 includes an intent to dilute minority voting strength regardless of retrogression.

### III

### A

The legal issue here is the meaning of "abridging" in the provision of § 5 that preclearance of a districting change in a covered jurisdiction requires a showing that the new plan does not "have the purpose . . . of denying or abridging the right to vote on account of race or color . . . ." The language tracks that of the Fifteenth Amendment's guarantee that "[t]he right of citizens . . . to vote shall not be

denied or abridged . . . on account of race [or] color . . . ." Since the Act is an exercise of congressional power under § 2 of that Amendment, *South Carolina* v. *Katzenbach*, 383 U. S. 301, 325–327 (1966), the choice to follow the Amendment's terminology is most naturally read as carrying the meaning of the constitutional terms into the statute. *United States* v. *Kozminski*, 487 U. S. 931, 945 (1988) ("By employing the constitutional language, Congress apparently was focusing on the prohibition of comparable conditions"); cf. *Morissette* v. *United States*, 342 U. S. 246, 263 (1952) ("[W]here Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed"). Any construction of the statute, therefore, carries an implication about the meaning of the Amendment, absent some good reason to treat the parallel texts differently on some particular point, and a reading of the statute that would not fit the Constitution is presumptively wrong.[10]

---

[10] The majority argues that we should construe purpose and effect uniformly, as we would in laws regulating price discrimination, savings and loans, and cable franchises. See *ante*, at 331–332. I find the Fifteenth Amendment more relevant in interpreting § 5; the constitutional language provides a reason to give purpose its full breadth. The majority also claims that its reading leaves the purpose prong with some meaning because the Government need only refute a jurisdiction's claim that a change lacks retrogressive purpose in order to deny preclearance, without countering the jurisdiction's evidence regarding actual retrogressive effect. *Ante*, at 332. This assumes that purpose is easier to prove than effect. While that may be true in price-fixing cases, it is not true in voting rights cases (even though purpose is conceptually simpler than effect under § 5, see *infra*, at 367–368). Here, as in many other race discrimination cases, the parties agreed about the effects of the proposed changes while hotly disputing the reasons for them. The majority limits the purpose prong to the few cases in which attempted retrogression fails of its goal, a rather

In each context, it is clear that abridgment necessarily means something more subtle and less drastic than the complete denial of the right to cast a ballot, denial being separately forbidden. Abridgment therefore must be a condition in between complete denial, on the one hand, and complete enjoyment of voting power, on the other. The principal concept of diminished voting strength recognized as actionable under our cases is vote dilution, defined as a regime that denies to minority voters the same opportunity to participate in the political process and to elect representatives of their choice that majority voters enjoy. See, *e. g., Thornburg* v. *Gingles,* 478 U. S., at 46–47; 42 U. S. C. § 1973. The benchmark of dilution pure and simple is thus a system in which every minority voter has as good a chance at political participation and voting effectiveness as any other voter. Our cases have also recognized retrogression as a subspecies of dilution, the consequence of a scheme that not only gives a minority voter a lesser practical chance to participate and elect than a majority voter enjoys, but even reduces the minority voter's practical power from what a preceding scheme of electoral law provided. See *Beer* v. *United States,* 425 U. S., at 141. Although our cases have dealt with vote dilution only under the Fourteenth Amendment, see, *e. g., Shaw* v. *Reno,* 509 U. S. 630, 645 (1993), I know of no reason in text or history that dilution is not equally violative of the Fifteenth Amendment guarantee against abridgment. And while there has been serious dispute in the past over the Fourteenth Amendment's coverage of voting rights, see, *e. g., Oregon* v. *Mitchell,* 400 U. S. 112, 154 (1970) (Harlan, J., concurring in part and dissenting in part), I know of no reason to doubt that "abridg[e]" in the Fifteenth Amendment includes dilutive discrimination. See *Bossier Parish I,* 520

---

paltry coverage given that it is discriminatory purpose, not discriminatory effect, that is at the heart of the Fifteenth Amendment.

U. S., at 494–495 (BREYER, J., concurring in part and concurring in judgment).[11]

The Court has never held (save in *Beer*) that the concept of voting abridgment covers only retrogressive dilution, and any such reading of the Fifteenth Amendment would be outlandish. The Amendment contains no textual limitation on abridgment, and when it was adopted, the newly emancipated citizens would have obtained practically nothing from a mere guarantee that their electoral power would not be further reduced. Since § 5 of the Act is likewise free of any

---

[11] We have suggested, but have never explicitly decided, that the Fifteenth Amendment applies to dilution claims. See *Mobile* v. *Bolden*, 446 U. S. 55, 62–63 (1980) (plurality opinion); *Gomillion* v. *Lightfoot*, 364 U. S. 339, 346 (1960) (singling out racial minority for discriminatory treatment in voting violates Fifteenth Amendment, which prohibits municipal boundaries drawn to exclude blacks). But see *Mobile, supra*, at 84, n. 3 (STEVENS, J., concurring in judgment) (suggesting that *Mobile* plurality said that Fifteenth Amendment does not reach vote dilution); *Voinovich* v. *Quilter*, 507 U. S. 146, 159 (1993) (reserving the question); *Shaw* v. *Reno*, 509 U. S. 630, 645 (1993) (endorsing the practice of considering dilution claims under the Fourteenth Amendment); *Beer* v. *United States*, 425 U. S. 130, 142, n. 14 (1976).

The majority claims that *Gomillion* was not about dilution because it involved the exclusion of black voters from municipal elections. *Ante*, at 334–335, n. 3. The voters excluded from the gerrymandered Tuskegee were left in unincorporated areas, where they could, at most, vote for county and state officials. Changing political boundaries to affect minority voting power would be called dilution today. *Gomillion* shows that the physical image evoked by the term "dilution" does not encompass all the ways in which participation in the political process can be made unequal. That the Court did not use the word "dilution" in its modern sense in *Gomillion* does not diminish the force of its Fifteenth Amendment analysis.

The majority also suggests, *ante*, at 334–335, n. 3, that the *Mobile* plurality explicitly rejected reliance on the Fifteenth Amendment. But the same plurality recognized that "'deny or abridge'" in § 2 of the Voting Rights Act mirrored the cognate language of the Fifteenth Amendment, *Mobile, supra*, at 60–61, and we have since held that the language of § 2 includes nonretrogressive dilution claims. See, *e. g., Voinovich* v. *Quilter, supra*, at 157.

language qualifying or limiting the terms of abridgment which it shares with the Amendment, abridgment under § 5 presumably covers any vote dilution, not retrogression alone, and no redistricting scheme should receive preclearance without a showing that it is nondilutive. See *Bossier Parish I, supra,* at 493 (BREYER, J., concurring in part and concurring in judgment) (use in § 5 of Fifteenth Amendment language indicates that § 5 prohibits new plans with dilutive purposes). Such, in fact, was apparently just what Congress had in mind when it addressed § 5 to the agility of covered jurisdictions in keeping one step ahead of dilution challenges under the Constitution (and previous versions of the Voting Rights Act) by adopting successive voting schemes, each with a distinctive feature that perpetuated the abridgment of the minority vote:

> "Congress had found that case-by-case litigation was inadequate to combat widespread and persistent discrimination in voting, because of the inordinate amount of time and energy required to overcome the obstructionist tactics invariably encountered in these lawsuits. After enduring nearly a century of systematic resistance to the Fifteenth Amendment, Congress might well decide to shift the advantage of time and inertia from the perpetrators of the evil to its victims." *South Carolina* v. *Katzenbach,* 383 U. S., at 328 (footnote omitted).

This evil in Congress's sights was discrimination, abridgment of the right to vote, not merely discrimination that happens to cause retrogression, and Congress's intent to frustrate the unconstitutional evil by barring a replacement scheme of discrimination from being put into effect was not confined to any one subset of discriminatory schemes. The School Board's purpose thus seems to lie at the very center of what Congress meant to counter by requiring preclearance, and the Court's holding that any nonretrogressive purpose survives § 5 is an exceedingly odd conclusion.

## B

The majority purports to shoulder its burden to justify a limited reading of "abridging" by offering an argument from the "context" of § 5. Since § 5 covers only changes in voting practices, this fact is said to be a reason to think that "abridging" as used in the statute is narrower than its cognate in the Fifteenth Amendment, which covers both changes and continuing systems. *Ante,* at 329–330, 333–334. In other words, on the majority's reading, the baseline in a § 5 challenge is the status quo that is to be changed, while the baseline in a Fifteenth Amendment challenge (or one under § 2 of the Voting Rights Act) is a nondiscriminatory regime, whether extant or not. From the fact that § 5 applies only when a voting change is proposed, however, it does not follow that the baseline of abridgment is the status quo; Congress could perfectly well have decided that when a jurisdiction is forced to change its voting scheme (because of malapportionment shown by a new census, say), it ought to show that the replacement is constitutional. This, of course, is just what the unqualified language and its Fifteenth Amendment parallel would suggest.

In fact, the majority's principal reason for reading intent to abridge as covering only intent to cause retrogression is not the peculiar context of changes in the law, but *Beer* v. *United States,* 425 U. S. 130 (1976), which limited the sort of "effect" that would be an abridgment to retrogressive effect. The strength of the majority's position, then, depends on the need for parallel limitations on the purpose and effect prongs of § 5. The need, however, is very much to the contrary.

### 1

Insofar as *Beer* is authority for defining the "effect" of a redistricting plan that would bar preclearance under § 5, I will of course respect it as precedent. The policy of *stare decisis* is at its most powerful in statutory interpretation

(which Congress is always free to supersede with new legislation), see *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197, 202 (1991), and § 5 presents no exception to the rule that when statutory language is construed it should stay construed. But it is another thing entirely to ignore error in extending discredited reasoning to previously unspoiled statutory provisions. That, however, is just what the Court does in extending *Beer* from § 5 effects to § 5 purpose.

*Beer* was wrongly decided, and its error should not be compounded in derogation of clear text and equally clear congressional purpose. The provision in § 5 barring preclearance of a districting plan portending an abridging effect is unconditional (and just as uncompromising as the bar to plans resting on a purpose to abridge). The *Beer* Court nonetheless sought to justify the imposition of a nontextual limitation on the forbidden abridging effect to retrogression by relying on a single fragment of legislative history, a statement from a House Report that § 5 would prevent covered jurisdictions from "'undo[ing] or defeat[ing] the rights recently won'" by blacks. *Beer, supra*, at 140 (quoting H. R. Rep. No. 91–397, p. 8 (1969)).[12] Relying on this one statement, however, was an act of distorting selectivity, for the legislative history is replete with references to the need to block changes in voting practices that would perpetuate existing discrimination and stand in the way of truly nondiscriminatory alternatives. In the House of Representatives, the Judiciary Committee noted that "even after apparent defeat[s] resisters seek new ways and means of discriminating.

---

[12] Section 5 was promulgated by the 89th Congress, but Congress's attention has repeatedly returned to it as the duration of the Voting Rights Act has been extended and the Act has been amended. See, *e. g.,* *Bossier Parish I,* 520 U. S. 471, 505–506 (1997) (STEVENS, J., dissenting in part and concurring in part) (discussing 1982 amendments); Voting Rights Act of 1965, Amendments of 1975, 89 Stat. 400; Voting Rights Act Amendments of 1970, 84 Stat. 315.

Barring one contrivance too often has caused no change in result, only in methods," H. R. Rep. No. 439, 89th Cong., 1st Sess., 10 (1965), and the House Report described how jurisdictions had used changes in voting practices to stave off reform. By making trifling changes in registration requirements, for example, Dallas County, Alabama, was able to terminate litigation against it without registering more than a handful of minority voters, see *id.*, at 10–11, and new practices were similarly effective devices for perpetuating discrimination in other jurisdictions as well, see S. Rep. No. 162, pt. 3, pp. 8–9 (1965) (Joint Statement of Individual Views by Sens. Dodd, Hart, Long, Kennedy, Bayh, Burdick, Tydings, Dirksen, Hruska, Fong, Scott, and Javits). After losing voting rights cases, jurisdictions would adopt new voting requirements "'as a means for continuing the rejection of qualified Negro applicants.'" *Id.*, at 12 (quoting *United States* v. *Parker*, 236 F. Supp. 511, 517 (MD Ala. 1964)). Thanks to the discriminatory traditions of the jurisdictions covered by §5, these new practices often avoided retrogression[13] even as they stymied improvements. In the days before §5, the ongoing litigation would become moot and minority litigants would be back at square one, shouldering the burden of new challenges with the prospect of further dodges to come. *Beer, supra,* at 152, n. 9 (Marshall, J., dissenting).

The intent of Congress to address the frustration of running to stay in place was manifest when it extended the Voting Rights Act in 1969:

"Prior to the enactment of the 1965 act, new voting rules of various kinds were resorted to in several States in order to perpetuate discrimination in the face of

---

[13] The legislative history did not use the terms "retrogression" and "dilution" to describe discriminatory regimes. In the Voting Rights Act context, the former appears for the first time in a federal case in *Beer,* 425 U. S., at 141; the latter made its first appearance in *Allen* v. *State Bd. of Elections,* 393 U. S. 544 (1969).

adverse Federal court decrees and enactments by the Congress. . . . In order to preclude such future State or local circumvention of the remedies and policies of the 1965 act, [§ 5 was enacted]. . . .

"The record before the committee indicates that as Negro voter registration has increased under the Voting Rights Act, several jurisdictions have undertaken new, unlawful ways to diminish the Negroes' franchise and to defeat Negro and Negro-supported candidates. The U. S. Commission on Civil Rights has reported that these measures have taken the form of switching to at-large elections where Negro voting strength is concentrated in particular election districts and facilitating the consolidation of predominently [sic] Negro and predominently [sic] white counties. Other changes in rules or practices affecting voting have included increasing filing fees in elections where Negro candidates were running; abolishing or making appointive offices sought by Negro candidates; extending the term of office of incumbent white officials, and withholding information about qualifying for office from Negro candidates." H. R. Rep. No. 91–397, at 6–7.

See also 115 Cong. Rec. 38486 (1969) (remarks of Rep. Mc-Culloch) (listing "new methods by which the South achieves an old goal" of maintaining white control of the political process).

Congress again expressed its views in 1975:

"In recent years the importance of [§ 5] has become widely recognized as a means of promoting and preserving minority political gains in covered jurisdictions. . . .

. . . . .

". . . As registration and voting of minority citizens increases, other measures may be resorted to which would dilute increasing minority voting strength. Such other measures may include switching to at-large elec-

tions, annexations of predominantly white areas, or the adoption of discriminatory redistricting plans." S. Rep. No. 94–295, pp. 15–17 (citation omitted).

Congress thus referred to §5 as a way to make the situation better ("promoting"), not merely as a stopgap to keep it from getting worse ("preserving").

It is all the more difficult to understand how the majority in *Beer* could have been so oblivious to this clear congressional objective, when a decade before *Beer* the Court had realized that modifying legal requirements was the way discriminatory jurisdictions stayed one jump ahead of the Constitution. In *United States* v. *Mississippi,* 380 U. S. 128 (1965), the Court described a series of ingenious devices preventing minority registration, and in *South Carolina* v. *Katzenbach,* 383 U. S. 301 (1966), the Court said that

> "Congress knew that some of the States . . . had resorted to the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees. Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself." *Id.,* at 335 (footnote omitted); see also *id.,* at 314–315.

Likewise, well before *Beer,* our nascent dilution jurisprudence addressed practices mentioned in the congressional lists of tactics targeted by §5. See, *e. g., White* v. *Regester,* 412 U. S. 755, 765–766, 768–769 (1973).

In fine, the full legislative history shows beyond any doubt just what the unqualified text of §5 provides. The statute contains no reservation in favor of customary abridgment grown familiar after years of relentless discrimination, and the preclearance requirement was not enacted to authorize covered jurisdictions to pour old poison into new bottles. See *post,* at 374–376 (BREYER, J., dissenting). *Beer* was

wrong, and while it is entitled to stand under our traditional *stare decisis* in statutory interpretation, *stare decisis* does not excuse today's decision to compound *Beer*'s error.[14]

## 2

Giving purpose-to-abridge the broader, intended reading while preserving the erroneously truncated interpretation of effect would not even result in a facially irrational scheme. This is so because intent to dilute is conceptually simple, whereas a dilutive abridgment-in-fact is not readily defined and identified independently of dilutive intent. A purpose to dilute simply means to subordinate minority voting power; exact calibration is unnecessary to identify what is intended. Any purpose to give less weight to minority participation in the electoral process than to majority participation is a purpose to discriminate and thus to "abridge" the right to vote. No further baseline is needed because the enquiry goes to the direction of the majority's aim, without reference to details of the existing system.

Dilutive effect, for the reason the majority points out, is different. Dilutive effect requires a baseline against which to compare a proposed change. While the baseline is in theory the electoral effectiveness of majority voters, dilution is not merely a lack of proportional representation, see *Davis* v. *Bandemer*, 478 U. S. 109, 131 (1986) (opinion of White, J.), and we have held that the maximum number of possible majority-minority districts cannot be the standard, see, *e. g.*, *Miller* v. *Johnson*, 515 U. S., at 925–926. Thus we have held that an enquiry into dilutive effect must rest on some

---

[14] The Court says this "lengthy expedition into legislative history" leaves me "emptyhanded" for the reason that nothing shows that today's notions of vote dilution were particularly in the congressional mind. *Ante*, at 335, n. 4. But the whole point of the legislative history is that Congress meant to guard against just those discriminatory devices that were as yet untried. Congress did not know what the covered jurisdictions would think up next.

idea of a reasonable allocation of power between minority and majority voters; this requires a court to compare a challenged voting practice with a reasonable alternative practice. See *Holder* v. *Hall*, 512 U. S. 874, 880 (1994) (opinion of KENNEDY, J.); *id.*, at 887–888 (O'CONNOR, J., concurring in part and concurring in judgment); see also *Johnson* v. *De Grandy*, 512 U. S. 997, 1018 (1994). Looking only to retrogression in effect, while looking to any dilutive or other abridgment in purpose, avoids the difficulty of baseline derivation. The distinction was not intended by Congress, but such a distinction is not irrational.

Indeed, the Justice Department has always taken the position that *Beer* is limited to the effect prong and puts no limitation on discriminatory purpose in §5. See Brief for Federal Appellant 32–33. The Justice Department's longstanding practice of refusing to preclear changes that it determined to have an unconstitutionally discriminatory purpose, both before and after *Beer*, is entitled to "particular deference" in light of the Department's "central role" in administering §5. *Dougherty County Bd. of Ed.* v. *White*, 439 U. S. 32, 39 (1978); see also *United States* v. *Sheffield Bd. of Comm'rs*, 435 U. S. 110, 131–132 (1978); *Perkins* v. *Matthews*, 400 U. S. 379, 390–391 (1971). Most significant here, the fact that the Justice Department has for decades understood *Beer* to be limited to effect demonstrates that such a position is entirely consistent and coherent with the law as declared in *Beer*, even though it may not have been what Congress intended.

3

Giving wider scope to purpose than to effect under §5 would not only preserve the capacity of §5 to bar preclearance to all intended violations of the Fifteenth Amendment,[15] it would also enjoy the virtue of consistency with

---

[15] JUSTICE BREYER developed this justification for giving full effect to the "purpose" prong in his opinion in *Bossier Parish I*, 520 U. S., at 493–497 (opinion concurring in part and concurring in judgment). Section 2,

prior decisions apart from *Beer*. In *Richmond* v. *United States*, 422 U. S. 358 (1975), the Court held that a city's territorial annexation reducing the percentage of black voters could not be recognized as a legal wrong under the effect prong of §5, but remanded for further consideration of discriminatory purpose. The majority distinguishes *Richmond* as "nothing more than an *ex necessitate* limitation upon the effect prong in the particular context of annexation." *Ante*, at 330. But in fact, *Richmond* laid down no eccentric effect rule and is squarely at odds with the majority's position that only an act taken with intent to produce a forbidden effect is forbidden under the intent prong.

As to forbidden effect, the *Richmond* Court said this:

"As long as the ward system fairly reflects the strength of the Negro community as it exists after the annexation, we cannot hold, without more specific legislative direction, that such an annexation is nevertheless barred by §5. It is true that the black community, if there is racial bloc voting, will command fewer seats on the city council; and the annexation will have effected a decline

---

as amended, now invalidates facially neutral practices with discriminatory effects even in the absence of purposeful discrimination, and is thus no longer coextensive with our understanding of the Constitution. The effects-only standard was added after the Court made clear, after years of uncertainty, that the Constitution prohibited only purposeful discrimination, not neutral action with a disparate impact on minorities.

The Court has divided on the effect of this change on §5. Compare *id.*, at 484, with *id.*, at 505–506 (STEVENS, J., dissenting in part and concurring in part). As JUSTICE BREYER explained, that the effects prong now goes beyond the Constitution has no bearing on whether we should limit the meaning of the purpose prong, which does no more than repeat what the Constitution requires. *Id.*, at 493–494. Both retrogressive and nonretrogressive discriminatory purposes violate the Constitution. As I have said already, I agree with JUSTICE BREYER that there is no evidence that Congress intended to include in §5 only part of what the Constitution prohibits. See *id.*, at 494. The tides of constitutional interpretation have buffeted both §2 and §5, but have never ebbed so low as to approve of discriminatory, dilutive purpose.

in the Negroes' relative influence in the city. But a different city council and an enlarged city are involved after the annexation. Furthermore, Negro power in the new city is not undervalued, and Negroes will not be underrepresented on the council.

"As long as this is true, we cannot hold that the effect of the annexation is to deny or abridge the right to vote." 422 U. S., at 371.

As *Richmond*'s references to "undervaluation" and "underrepresentation" make clear, the case involves application of standard Fifteenth Amendment principles to the annexation context, not an annexation exception. As long as the postannexation city allowed black voters to participate on equal terms with white voters, the annexation did not "abridge" their voting rights even if they thereafter made up a smaller proportion of the voting population. The Court also held, however, that in adopting the very plan whose effect had been held to be outside the scope of legal wrong, the city could have acted with an unlawful, discriminatory intent that would have rendered the annexation unlawful and barred approval under § 5:

"[I]t may be asked how it could be forbidden by § 5 to have the purpose and intent of achieving only what is a perfectly legal result under that section and why we need remand for further proceedings with respect to purpose alone. The answer is plain, and we need not labor it. An official action, whether an annexation or otherwise, taken for the purpose of discriminating against Negroes on account of their race has no legitimacy at all under our Constitution or under the statute. Section 5 forbids voting changes taken with the purpose of denying the vote on the grounds of race or color." *Id.*, at 378.

It follows from *Richmond* that a plan lacking any underlying purpose to cause disqualifying retrogression may be barred by a discriminatory intent.

The majority's attempt to distinguish *Pleasant Grove* v. *United States,* 479 U. S. 462 (1987), is equally vain. Whereas *Richmond* dealt with the argument that law and logic barred finding a disqualifying intent when effect was lawful, *Pleasant Grove* dealt with the argument that finding a disqualifying intent was impossible in fact. The Court in *Pleasant Grove* denied preclearance to an annexation that added white voters to the city's electorate, despite the fact that at the time of the annexation minority voting strength was nonexistent and officials of the city seeking the annexation were unaware of any black voters whose votes could be diluted. One thing is clear beyond peradventure: the annexation in that case could not have been intended to cause retrogression. No one could have intended to cause retrogression because no one knew of any minority voting strength from which retrogression was possible. 479 U. S., at 465, n. 2. The fact that the annexation was nonetheless barred under the purpose prong of §5, 11 years after *Beer,* means that today's majority cannot hold as they do without overruling *Pleasant Grove.*

The majority seeks to avoid *Pleasant Grove* by describing it as barring "future retrogression" by nipping any such future contingency even before the bud had formed. This gymnastic, however, not only overlooks the contradiction between *Pleasant Grove's* holding that a voting change without possible retrogressive intent could fail under the purpose prong and the majority's reasoning today that the baseline for the purpose prong is the status quo; it even ignores what the Court actually said. While the *Pleasant Grove* Court said that impermissible purpose could relate to anticipated circumstances, 479 U. S., at 471–472, it said nothing about anticipated retrogression (a concept familiar to the Court

since the time of *Beer*). The Court found it "plausible" that the city had simply acted with "the impermissible purpose of minimizing future black voting strength." 479 U. S., at 471–472 (footnote omitted). The Court spoke of "minimizing," not "causing retrogression to." But there is more:

> "One means of thwarting [integration] is to provide for the growth of a monolithic white voting block, thereby effectively diluting the black vote in advance. This is just as impermissible a purpose as the dilution of present black voting strength. Cf. *City of Richmond*, [422 U. S.,] at 378." *Id.*, at 472.

That is, a nonretrogressive dilutive purpose is just as impermissible under § 5 as a retrogressive one. Today's holding contradicts that. The majority is overruling *Pleasant Grove.*

The majority proffers no justification for denying the precedential value of *Pleasant Grove.* Instead it observes that reading the purpose prong of § 5 as covering more than retrogression (as *Richmond* and *Pleasant Grove* read it) would "exacerbate the 'substantial' federalism costs that the preclearance procedure already exacts." *Ante*, at 336. But my reading, like the Court's own prior reading, would not raise the cost of federalism one penny above what the Congress meant it to be. The behavior of Bossier Parish is a plain effort to deny the voting equality that the Constitution just as plainly guarantees. The point of § 5 is to thwart the ingenuity of the School Board's effort to stay ahead of challenges under § 2. Its object is to bring the country closer to transcending a history of intransigence to enforcement of the Fifteenth Amendment. Now, however, the promise of § 5 is substantially diminished. Now executive and judicial officers of the United States will be forced to preclear illegal and unconstitutional voting schemes patently intended to perpetuate discrimination. The appeal to federalism is no excuse. I respectfully dissent.

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, dissenting.

In its administration of the voting rights statute for the past quarter century, the Department of Justice has consistently employed a construction of the Voting Rights Act of 1965 contrary to that imposed upon the Act by the Court today. Apart from the deference such constructions are always afforded, the Department's reading points us directly to the necessary starting point of any exercise in statutory interpretation—the plain language of the statute.

It is not impossible that language alone would lead one to think that the phrase "will not have the effect" includes some temporal measure; the noun "effect" and the verb tense "will have" could imaginably give rise to a reading that requires a comparison between what is and what will be. But there is simply nothing in the word "purpose" or the entire phrase "does not have the purpose" that would lead anyone to think that Congress had anything in mind but a present-tense, intentional effort to "den[y] or abridg[e] the right to vote on account of race." See, e. g., Webster's Third New International Dictionary 1847 (1966). Ergo, if a municipality intends to deny or abridge voting rights because of race, it may not obtain preclearance.

Like JUSTICE SOUTER, I am persuaded that the dissenting opinions of Justices White and Marshall were more faithful to the intent of the Congress that enacted the Voting Rights Act of 1965 than that of the majority in *Beer* v. *United States*, 425 U. S. 130 (1976). One need not, however, disavow that precedent in order to explain my profound disagreement with the Court's holding today. The reading above makes clear that there is no necessary tension between the *Beer* majority's interpretation of the word "effect" in § 5 and the Department's consistent interpretation of the word "purpose." For even if retrogression is an acceptable standard for identifying prohibited effects, that assumption does not justify an interpretation of the word

"purpose" that is at war with both controlling precedent and the plain meaning of the statutory text.

Accordingly, for these reasons and for those stated at greater length by JUSTICE SOUTER, I respectfully dissent.

JUSTICE BREYER, dissenting.

I agree with JUSTICE SOUTER, with one qualification. I would not reconsider the correctness of the Court's decision in *Beer* v. *United States*, 425 U. S. 130 (1976)—an "effects" case—because, regardless, § 5 of the Voting Rights Act of 1965 prohibits preclearance of a voting change that has the purpose of unconstitutionally depriving minorities of the right to vote.

As JUSTICE SOUTER points out, *ante*, at 360–361 (opinion concurring in part and dissenting in part), Congress enacted § 5 in 1965 in part to prevent certain jurisdictions from limiting the number of black voters through "the extraordinary stratagem of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees." *South Carolina* v. *Katzenbach*, 383 U. S. 301, 335 (1966). This "stratagem" created a moving target with a consequent risk of judicial runaround. See, *e. g., Perkins* v. *Matthews*, 400 U. S. 379, 395–396 (1971). And this "stratagem" could prove similarly effective where the State's "new rules" were intended to retrogress and where they were not. Indeed, since at the time, in certain places, historical discrimination had left the number of black voters at close to zero, retrogression would have proved virtually impossible where § 5 was needed most.

An example drawn from history makes the point clear. In Forrest County, Mississippi, as of 1962, precisely three-tenths of 1% of the voting age black population was registered to vote. *United States* v. *Mississippi*, 229 F. Supp. 925, 994, n. 86 (SD Miss. 1964) (dissenting opinion), rev'd, 380 U. S. 128 (1965). This number was due in large part to the county registrar's discriminatory application of the State's

voter registration requirements. Prior to 1961, the registrar had simply refused to accept voter registration forms from black citizens. See *United States* v. *Lynd*, 301 F. 2d 818, 821 (CA5 1962). After 1961, those blacks who were allowed to apply to register had been subjected to a more difficult test than whites, while whites had been offered assistance with their less taxing applications. And the registrar, upon denying the applications of black citizens, had refused to supply them with an explanation. *Id.*, at 822. The Government attacked these practices, and the Fifth Circuit enjoined the registrar from "[f]ailing to process applications for registrations submitted by Negro applicants on the same basis as applications submitted by white applicants." *Id.*, at 823.

Mississippi's "immediate response" to this injunction was to impose a "good moral character requirement," *Mississippi, supra*, at 997, a standard this Court has characterized as "an open invitation to abuse at the hands of voting officials," *Katzenbach, supra*, at 313. One federal judge believed that this change was designed to avoid the Fifth Circuit's injunction by "defy[ing] a Federal Appellate Court determination that particular applicants were qualified [to vote]." *Mississippi, supra*, at 997. Such defiance would result in *maintaining*—though *not*, in light of the absence of blacks from the Forrest County voting rolls, in *increasing*—white political supremacy.

This is precisely the kind of activity for which §5 was designed, and the purpose of §5 would have demanded its application in such a case. See, *e. g., Perkins, supra*, at 395–396 (Congress knew that the "Department of Justice d[id] not have the resources to police effectively all the States . . . covered by the Act," and §5 was intended to ensure that States not institute "new laws with respect to voting that might have a racially discriminatory purpose"); *Katzenbach, supra*, at 314 (Prior to 1965, "[e]ven when favorable decisions ha[d] finally been obtained, some of the States affected ha[d]

merely switched to discriminatory devices not covered by the federal decrees").

And nothing in the Act's language or its history suggests the contrary. See, *e. g.,* H. R. Rep. No. 439, 89th Cong., 1st Sess., 10 (1965) ("Barring one contrivance too often has caused no change in result, only in methods"); S. Rep. No. 162, 89th Cong., 1st Sess., pt. 3, p. 12 (1965) (joint views of 12 members of Senate Judiciary Committee, describing *United States* v. *Parker,* 236 F. Supp. 511, 517 (MD Ala. 1964), in which a jurisdiction responded to an injunction by instituting various means for "the rejection of qualified Negro applicants"); Hearings on H. R. 6400 before Subcommittee No. 5 of the House Committee on the Judiciary, 89th Cong., 1st Sess., 5 (1965) (testimony of Attorney General Katzenbach) (discussing those jurisdictions that are "able, even after apparent defeat in the courts, to devise whole new methods of discrimination"); Hearings on S. 1564 before the Senate Committee on the Judiciary, 89th Cong., 1st Sess., pt. 1, p. 11 (1965) (testimony of Attorney General Katzenbach) (similar).

It seems obvious, then, that if Mississippi had enacted its "moral character" requirement in 1966 (after enactment of the Voting Rights Act), a court applying § 5 would have found "the purpose . . . of denying or abridging the right to vote on account of race," even if Mississippi had intended to permit, say, 0.4%, rather than 0.3%, of the black voting age population of Forrest County to register. And if so, then irrespective of the complexity surrounding the administration of an "effects" test, the answer to today's *purpose* question is "yes."