# STATE OF RESIDENCE REQUIREMENTS FOR FIREARMS TRANSFERS

*Section 922(b)(3) of title 18, which forbids federal firearms licensees from selling or delivering "any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located," cannot be interpreted to define "reside in . . . the State" differently for citizens and aliens.*

January 30, 2012

## MEMORANDUM OPINION FOR THE CHIEF COUNSEL, BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES

The Gun Control Act of 1968 ("GCA" or "the Act") contains a series of provisions that regulate transactions involving firearms and ammunition. 18 U.S.C. § 922 (2006 & Supp. IV 2010).[1] One such provision forbids federal firearms licensees ("FFLs")—persons who are licensed under federal law to import, manufacture, or deal in firearms—from selling or delivering "any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in . . . the State in which the licensee's place of business is located." *Id.* § 922(b)(3). In a proposed final rule interpreting this provision, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") contemplates defining the term "reside in . . . the State" differently for citizens and aliens, as it has since 1968. *See* Memorandum for the Attorney General, from Kenneth E. Melson, Deputy Director, Bureau of Alcohol, Tobacco, Firearms and Explosives, *Re: Final Rule Concerning Residency Requirements for Persons Acquiring Firearms* at 2 (Apr. 30, 2010) (describing proposed final rule).

As part of our routine legal review of rules requiring the Attorney General's approval, this Office advised that the proposed definition was inconsistent with section 922(b)(3) of the Act. That section makes no distinction between citizens and aliens; it simply restricts the sale or delivery of firearms to "any person" who "does not reside in" the State where the FFL is located. 18 U.S.C. § 922(b)(3) (2006). The Supreme Court has rejected interpretations of statutes that would "adopt a construction" attributing "different meanings to the same phrase in the same sentence," as the proposed final rule would do. *See Reno v. Bossier Parish Sch. Bd.*, 528 U.S. 320, 329 (2000). Here, it is particularly difficult to justify an inference, without textual support, that state residency should be defined differently for citizens and aliens, because elsewhere in the statute, Congress expressly addressed the treatment of certain categories of aliens and enacted a special definition of state residency for a particular category of persons (members of the military on active duty, *see* 18 U.S.C. § 921(b) (2006)). In light of these considerations, we advised that section 922(b)(3) cannot be interpreted to define "reside in . . . the State" differently for citizens and aliens. At your request, this opinion memorializes and elaborates on our prior advice. *See* Memorandum for the Office of Legal Counsel, from Stephen R. Rubenstein, Chief Counsel, Bureau of Alcohol, Tobacco, Firearms and Explosives (Dec. 18, 2011) ("*Opinion Request*").

---

[1] Several of these provisions of the GCA, including 18 U.S.C. § 922(b)(3), were originally enacted several months before the enactment of the GCA, as part of Title IV of the Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, § 901(a)(1), 82 Stat. 197, 225-35. Where appropriate, we accordingly refer to legislative findings that Congress adopted in enacting the Omnibus Crime Control and Safe Streets Act. *See infra* p. 7.

**I.**

The federal Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213 (codified at 18 U.S.C. §§ 921-931), sets out "a detailed federal scheme" to govern "the distribution of firearms." *Printz v. United States*, 521 U.S. 898, 902 (1997). The Act regulates FFLs directly and also lays out a series of so-called "prohibitors" that define particular categories of individuals prohibited from engaging in certain firearms transactions.

Section 922(b)(3) of the GCA imposes the limitation on FFLs at issue here, providing in pertinent part:

> It shall be unlawful for any licensed importer, licensed manufacturer, licensed dealer, or licensed collector to sell or deliver any firearm to any person who the licensee knows or has reasonable cause to believe does not reside in (or if the person is a corporation or other business entity, does not maintain a place of business in) the State in which the licensee's place of business is located.[2]

The Act defines "person" broadly to "include any individual, corporation, company, association, firm, partnership, society, or joint stock company." 18 U.S.C. § 921(a)(1) (2006). The Act does not define what it means for such a person to "reside in . . . the State" as a general matter, but it does contain one special rule with respect to state residency: a member of the Armed Forces on active duty "is a resident of the State in which his permanent duty station is located" for purposes of the firearms provisions of title 18. *Id.* §§ 922(b)(3), 921(b).

Since 1968, ATF has maintained regulations defining the term "State of residence" (although that precise term does not appear in the GCA) and requiring potential firearms buyers to establish their state of residence, in order to implement the general statutory provision establishing that an FFL may not transact business with "any person" the FFL "knows or has reasonable cause to believe does not reside in . . . the State" in which the FFL is located. *See* Commerce in Firearms and Ammunition, 33 Fed. Reg. 18,555, 18,559 (Dec. 14, 1968) (defining "State of residence" for the first time); 27 C.F.R. § 478.11 (2011). These regulations have always given "State of residence" one meaning for U.S. citizens and another meaning for aliens. The definition of "State of residence" has changed somewhat over the years,[3] but the regulations have consistently required aliens to meet both the residency requirement that applies to citizens *and* an additional requirement that they have resided in the State "for a period of at least 90 days prior to the date of sale or delivery of a firearm." *See, e.g.*, Commerce in Firearms and Ammunition, 33 Fed. Reg. at 18,559; Residency Requirements for Persons Acquiring Firearms, 62 Fed. Reg. 19,442, 19,442 (Apr. 21, 1997); 27 C.F.R. § 478.11 (2011). (We will refer to this additional requirement as the "90-day requirement.") Consistent with this historical practice, the proposed final rule would provide that a citizen "present in a State with the intention of making a home in that State" would satisfy section 922(b)(3)'s requirement that he or she

---

[2] Section 922(b)(3) exempts certain transfers of rifles and shotguns from this general rule and provides that the rule "shall not apply to the loan or rental of a firearm to any person for temporary use for lawful sporting purposes."

[3] *See infra* n. 4.

"reside in . . . the State" where the FFL is located, but that an alien lawfully "present in a State with the intention of making a home in that State" would not satisfy that statutory requirement until the alien proved as well that he or she had resided in that State for a minimum of 90 days.[4] *Residency Requirements for Persons Acquiring Firearms*, at 21 (proposed rule, not published, intended to be codified at 27 C.F.R. 478).

In addition to laying out generally applicable restrictions, such as the one set forth in section 922(b)(3), the GCA also expressly prohibits certain categories of persons from engaging in firearms transactions. As relevant here, neither aliens "illegally or unlawfully in the United States," *see* 18 U.S.C. § 922(d)(5)(A) (2006); *id.* § 922(g)(5)(A), nor aliens who have been "admitted to the United States under a nonimmigrant visa," *see id.* § 922(d)(5)(B); *id.* § 922(g)(5)(B), may ship, transport, possess, or receive firearms or ammunition, with certain limited exceptions.[5] The GCA does not otherwise bar aliens as a category from engaging in firearms transactions; instead, aliens are subject to the same general regulatory requirements as U.S. citizens. *See generally United States v. Camacho*, 528 F.2d 464, 468-69 (9th Cir. 1976) (rejecting appellant's argument that the GCA does not restrict gun sales to visiting aliens who do not reside in any state, and stating: "An alien who has not established residence in the state where the licensed dealer is located falls within the class of persons to whom the dealer is not permitted to sell firearms under § 922(b)(3).").

The question we address is whether the proposed final rule's interpretation of section 922(b)(3) as authorizing different definitions of the term "reside in . . . the State" for citizens and aliens is consistent with the statutory scheme.

## II.

Based on the text of section 922(b)(3) and the overall statutory context, we conclude that the phrase "reside in . . . the State" in section 922(b)(3) cannot be interpreted differently for citizens and aliens and therefore may not be construed to impose different substantive requirements when aliens and citizens seek to obtain a firearm from an FFL.

The residency requirement in the text of section 922(b)(3) is established with a single phrase, "reside in . . . the State," that applies to all "person[s]." More specifically, section 922(b)(3) provides that a covered firearms transaction may not take place when "the [FFL] knows or has reasonable cause to believe" that the "person" who would receive the firearm

---

[4] In 1968, and for many years afterwards, ATF defined "State of residence" to mean "[t]he State in which an individual regularly resides, or maintains his home." Commerce in Firearms and Ammunition, 33 Fed. Reg. at 18,559. A 1997 interim final rule amended then-existing regulations interpreting section 922(b)(3) to require a purchaser of firearms to affirmatively declare his or her State of residence on the relevant ATF form and to require aliens legally in the United States to show substantiating documentation, such as a utility bill, to satisfy the 90-day rule. *Opinion Request* at 2-3. The proposed final rule would maintain these amendments but also eliminate an existing provision that allows aliens to establish residency by providing a letter from their embassy or consulate. We do not address that proposed rule change in this opinion. We also do not address the requirement that firearms purchasers affirmatively declare their "State of residence" on a form provided by ATF.

[5] Section 922(y)(2) lists various exceptions to the prohibitions applicable to nonimmigrant aliens admitted under a visa, and section 922(y)(3) sets out a waiver procedure for aliens subject to the same prohibitions. *See* 18 U.S.C. § 922(y) (2006).

"does not reside in . . . the State" where the FFL does business. 18 U.S.C. § 922(b)(3). The plain text of the statute thus appears to require ATF to apply the same standard to determine whether "any person . . . reside[s] in . . . the State," regardless of the citizenship status of the prospective buyer. *See id.*

The proposed final rule, however, would effectively adopt two different definitions of "reside in . . . the State." Citizens would be required to show only an intent to make a home in the State in which they were present, whereas aliens would be required to show that same intent and *also* prove that they had been present in the State for 90 days. We recognize that what it means to "reside" in a State may itself be susceptible to numerous interpretations. *See, e.g.*, *Downs v. Comm'r*, 166 F.2d 504, 508 (9th Cir. 1948); *Assistant U.S. Attorneys—Residency Requirement*, 3 Op. O.L.C. 360, 361 (1979). But regardless of how that term is defined, the plain text of section 922(b)(3) contemplates that the same definition will apply to "any person," citizen or alien, to whom an FFL seeks to sell or deliver a firearm (with the exception of members of the Armed Forces on active duty, to whom the Act expressly applies a different definition of state residency, *see supra* p. 2).

Nothing in the concept of state residence, moreover, suggests that it is appropriate to read a distinction between aliens and citizens into the statute where no such distinction exists in the text. We are aware of no background common-law definition of state residency, for example, that would suggest that state residency should be defined differently for aliens and citizens. *Cf. Clackamas Gastroenterology Assocs. v. Wells*, 538 U.S. 440 (2003) (observing that courts interpreting the statutory term "employee" look to its common-law meaning in different settings).[6]

Supreme Court precedent squarely supports this reading of the plain text of section 922(b)(3). In *Clark v. Martinez,* 543 U.S. 371 (2005), for example, the Court made clear that a single undifferentiated statutory term in section 241 of the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1231(a)(6), must be given the same meaning in all of its potential applications. In *Clark*, the Court interpreted INA section 241(a)(6), which authorizes the Attorney General to retain custody of aliens ordered removed from the United States beyond the 90-day period established by section 241(a)(1), *see* 8 U.S.C. § 1231(a)(1) (2000), and provides

---

[6] We examined the administrative record that accompanied ATF's 1968 interpretation of the state of residence requirement, but that record does not reveal a rationale behind the decision to establish different state residency requirements for citizens and aliens. Shortly after the GCA's enactment in 1968, the Director of the Alcohol and Tobacco Tax Division (which was then part of the Internal Revenue Service), issued a notice of proposed rulemaking defining a number of terms, but not "State of residence." *See* Commerce in Firearms and Ammunition, 33 Fed. Reg. 16,285, 16,288 (proposed Nov. 6, 1968). That definition first appeared in the final rule issued several weeks later, without elaboration. *See* Commerce in Firearms and Ammunition, 33 Fed. Reg. at 18,559; *see id.* at 18,555 ("Immediately following the definition of 'State' there is inserted a new definition."). We recognize that ATF's proposed definition is longstanding, but we do not think its "vintage" can overcome the meaning required by the statute's text. *Cf. Judulang v. Holder*, 132 S. Ct. 476, 488 (2011) ("vintage" is a "slender reed to support a significant government policy"); *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991) (abrogating a "longstanding administrative construction"—which the court below had noted dated back to "at least the year 1900," *Demarest v. Manspeaker*, 884 F.2d 1343, 1345 (10th Cir. 1989)—upon concluding that the agency's construction was inconsistent with the statute).

that three different categories of aliens "may be detained beyond the removal period." 543 U.S. at 377 (quoting 8 U.S.C. § 1231(a)(6)) (internal quotation marks omitted).

Four years earlier, in *Zadvydas v. Davis*, 533 U.S. 678 (2001), the Court had construed section 241(a)(6) in a particular way, in order to avoid a constitutional question. The Court held that the provision authorized the Executive Branch to detain one covered category of aliens— those deportable on certain crime-related grounds—for "only as long as 'reasonably necessary' to remove them from the country," rather than indefinitely, as the plain text of the statute might have suggested. *Clark*, 543 U.S. at 377 (quoting *Zadvydas*, 533 U.S. at 699). In light of *Zadvydas*, the *Clark* Court subsequently held that the construction it had given to the statutory phrase in *Zadvydas* also had to be applied to the inadmissible aliens covered by section 241(a)(6), even assuming that there were substantial reasons to treat inadmissible aliens and deportable aliens differently with respect to detention, as the government had argued. *Id.* at 380. The Court recognized that the constitutional concerns at issue in *Zadvydas* were not implicated in the case of inadmissible aliens. *Id.* But, the Court explained, "[t]he operative language of [the relevant statute], 'may be detained beyond the removal period,' applies without differentiation to all three categories of aliens that are its subject. To give these same words a different meaning for each category would be to invent a statute rather than interpret one." *Id.* at 378.

Notably, the Court acknowledged that the text of INA section 241(a)(6) was ambiguous and could have been validly interpreted to permit more protracted detention for inadmissible aliens. *Id.* But the Court rejected the notion that statutory ambiguity could justify two different simultaneous constructions of the same ambiguous phrase depending on the category of aliens to which the phrase applied:

> As the Court in *Zadvydas* recognized, the statute can be construed "literally" to authorize indefinite detention, or (as the Court ultimately held) it can be read to "suggest [less than] unlimited discretion" to detain. It cannot, however, be interpreted to do both at the same time.

*Id.* (internal citations omitted)*; see also id.* at 379 (giving the text the interpretation found in *Zadvydas* "because the statutory text provides for no distinction between admitted and nonadmitted aliens"). The Court observed that a contrary holding would establish "the dangerous principle that judges can give the same statutory text different meanings in different cases." *Id.* at 386; *see also Bossier Parish Sch. Bd.*, 528 U.S. at 329 ("As we have in the past, we refuse to adopt a construction that would attribute different meanings to the same phrase in the same sentence, depending on which object it is modifying."); *Bankamerica Corp. v. United States*, 462 U.S. 122, 129 (1983) ("[W]e reject as unreasonable the contention that Congress intended the phrase 'other than' to mean one thing when applied to 'banks' and another thing as applied to 'common carriers,' where the phrase 'other than' modifies both words in the same clause.").[7]

---

[7] Since *Clark*, the Supreme Court has reaffirmed the basic principle of interpretation on which it relied there. *See United States v. Santos*, 553 U.S. 507 (2008) (concluding that the term "proceeds" in the federal money-laundering statute, 18 U.S.C. § 1956(a)(1)(A)(i) (2006), means "profits" and not "receipts," and that its meaning must be uniform across contexts); *compare also id.* at 525 (Stevens, J., concurring in the judgment) (concluding that

*Clark* thus supports our conclusion that the proposed rule is not consistent with the statute, because the proposed rule would give the same phrase—"reside in . . . the State"—different constructions for U.S. citizens and aliens, even though no textual foundation for imposing a different substantive rule on aliens exists.

Our reading of the text of section 922(b)(3) also finds support in other provisions of the GCA, and in the legislative findings accompanying the Act. In particular, as noted above, section 922(g)(5) prohibits certain categories of aliens—those unlawfully present and those admitted under a nonimmigrant visa—from shipping, transporting, possessing, and receiving firearms and ammunition, with certain exceptions. *See also* 18 U.S.C. § 922(d)(5) (2006) (making it unlawful for any person to sell or dispose of firearms to unlawfully present aliens or aliens admitted under a nonimmigrant visa). This specific treatment of aliens elsewhere in section 922 counsels against inferring that Congress intended differential treatment of citizens and aliens where there is no textual or other support for such an inference.

Similarly, although the GCA does not define the phrase "reside . . . in the State," the Act's definition section does create a unique state residency requirement for one class of persons. As noted above, section 921(b) states that "a member of the Armed Forces on active duty is a resident of the State in which his permanent duty station is located" for the purposes of the firearms provisions of title 18. This language provides clear textual support for ATF's conclusion that the "State of residence" of active duty military personnel should be determined under a different standard than the one applicable to other persons. *See* 27 C.F.R. § 478.11 (2011) ("If an individual is on active duty as a member of the Armed Forces, the individual's State of residence is the State in which his or her permanent duty station is located."). Again, however, the presence of the express language defining state residency differently for one particular group of persons (military personnel) makes it difficult to argue that Congress intended to authorize a special definition of state residency for a second group of persons (aliens), because there is no express textual indication that Congress intended to do so. *See, e.g.*, *Demarest v. Manspeaker*, 498 U.S. 184, 188 (1991) (holding that prisoners who appear as witnesses in federal court are entitled to payment under a statute granting appearance fees to any "witness in attendance at any court of the United States," relying in part on the fact that other provisions of the statute expressly prohibited prisoners from receiving other kinds of fees, and in part on the fact that a subset of prisoners—detained aliens—was expressly excluded from the entitlement to appearance fees (internal quotation marks omitted)).[8]

---

"proceeds" could mean "receipts" or "profits" depending on the context, suggesting that, "[i]f Congress could have expressly defined the term 'proceeds' differently when applied to different specified unlawful activities, it seems to me that judges filling the gap in a statute with such a variety of applications may also do so, as long as they are conscientiously endeavoring to carry out the intent of Congress"), *with id.* at 522 (Scalia, J., concurring in the judgment) (describing Justice Stevens's approach as a form of "interpretive contortion," and contending that the Court had "forcefully rejected" that approach in *Clark*), *and id.* at 532 (Alito, J., dissenting) ("I cannot agree with Justice Stevens's approach insofar as it holds that the meaning of the term 'proceeds' varies depending on the nature of the illegal activity that produces the laundered funds . . . ."). *See also Pasquantino v. United States*, 544 U.S. 349, 358-59 (2005) (citing *Clark* in concluding that because the federal wire fraud statute, 18 U.S.C. § 1343, "applies without differentiation" to "fraudulent uses of domestic wires," it must necessarily apply to a scheme to use the domestic wires to deprive a foreign sovereign of taxes that are due).

[8] Congress subsequently adopted the Incarcerated Witness Fees Act of 1991, Pub. L. No. 102-417, 106 Stat. 2138 (1992), which amended the statute to eliminate witness fees for incarcerated persons.

Congress's express legislative findings with respect to the state residency requirement likewise fail to support the distinction made in the proposed final rule. These findings reflect Congress's concern over the "widespread traffic in firearms moving in or otherwise affecting interstate or foreign commerce," and the fact that "the existing Federal controls over such traffic do not adequately enable the States to control this traffic within their own borders through the exercise of their police power." Omnibus Crime Control and Safe Streets Act § 901(a)(1) (codified at 18 U.S.C. § 921 note). Congress concluded that this interstate traffic, which involved "the sale or other disposition of concealable weapons . . . to nonresidents of the State in which the licensees' places of business are located," tended to render ineffective "the laws, regulations, and ordinances in the several States and local jurisdictions regarding such firearms." *Id.* § 901(a)(5). These findings focus on the States' ability to regulate and control firearms transactions and do not suggest any unique concern with respect to State and local enforcement of firearms laws against aliens. In the Senate Report, statements concerning the State residency requirement, as originally enacted in the Omnibus Crime Control and Safe Streets Act, are to similar effect.[9]

In sum, we do not think Congress's use of the phrase "reside in . . . [a] State" supports different definitions of that phrase for citizens and aliens as a group, particularly in light of the principles of statutory interpretation laid out in *Clark*. We thus conclude that the proposed final rule reflects an interpretation of section 922(b)(3) that is not consistent with the statute.

/s/

VIRGINIA A. SEITZ
Assistant Attorney General

---

[9] *See, e.g.*, S. Rep. No. 90-1097, at 80 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2167 ("The provisions of the title which prohibit a licensee from disposing of firearms (other than rifles and shotguns) to persons who are not residents of the State in which [the FFL] conducts his business is justified by the record, which is replete with testimony documenting the fact that the purchase of such firearms by persons in other than their residence State is a serious contributing factor to crime."); *id.* at 114, *reprinted in* 1968 U.S.C.C.A.N. at 2204 (explaining that section 922(b)(3) "implements the strict controls over the interstate movements of pistols and revolvers in section 922(a)(2) as contained in the title," and is also "designed to prevent the avoidance of State and local laws controlling firearms other than rifles and shotguns by the simple expediency of crossing a State line to purchase one").